# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

————————

m 99-10232

————————

DANETTE HOPE GROS; ET AL.,

Plaintiffs,

DANETTE HOPE GROS; EDITH D. SIKES,

Plaintiffs-Appellees-
Cross-Appellants,

VERSUS

THE CITY OF GRAND PRAIRIE, TEXAS, ET AL.,

Defendants,

HARRY L. CRUM,

Defendant-Appellant-
Cross-Appellee.

————————————

Appeals from the United States District Court
for the Northern District of Texas

————————————

April 25, 2000

Before DAVIS, CYNTHIA HOLCOMB HALL,[*] and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

———————————

[*] Circuit Judge of the Ninth Circuit, sitting by designation.

Harry Crum appeals the denial of summary judgment on his qualified immunity defense in a 42 U.S.C. § 1983 suit brought by Danette Gros and Edith Sikes, who are cross-appealing those portions of the order that granted Crum summary judgment on qualified immunity grounds. Plaintiffs alleged that Crum, as Chief of Police of Grand Prairie, Texas, violated

their constitutional rights by hiring and failing properly to train and supervise an officer ("Rogers") who allegedly sexually assaulted them, and by having a hiring policy that allowed persons with a propensity toward violent behavior into the Grand Prairie Police Department ("GPPD"). Concluding that there was no genuine issue of material fact as to Crum's deliberate indifference to plaintiffs' constitutional rights, we reverse the denial of summary judgment and remand for further proceedings. We also decline to exercise pendent appellate jurisdiction over plaintiffs' cross-appeals, so we dismiss those cross-appeals.

## I.

Gros and Sikes allege that Rogers, a former GPPD officer, physically, sexually, and verbally abused them. Gros contends that during a routine traffic stop, Rogers used excessive force against her. While on routine patrol, Rogers pulled Gros over for driving without wearing a seatbelt. After being stopped for about twenty minutes, Gros exited her vehicle and inquired of Rogers how much longer the stop would take. Rogers ordered Gros back into the car, at which point Gros stated that she had an appointment and needed to leave as soon as possible.

Rogers then allegedly grabbed Gros's arm, twisted it behind her back, threw her on top of her car, and reached into her blouse and grabbed her breast. He then handcuffed her and placed her under arrest without a recitation of *Miranda* warnings, putting her in his squad car on a hot day with the windows closed. Eventually he rolled down his window a little to aerate the inside, but then turned the volume on the radio up very high, allegedly to prevent passers-by from hearing Gros's requests for help.

At the police station, Gros immediately complained of her treatment to Rogers's supervisors. As a result, an investigation of Rogers's conduct with respect to this incident was conducted in which the internal investigative unit of the GPPD determined that Gros's claim was "not sustained."

Sikes contends that in February 1996, while responding to a call, Rogers sexually abused her. Sikes had been stopped by Rogers and advised that there was an outstanding warrant for her arrest for not paying traffic tickets. Sikes asked Rogers not to take her to jail, and while telling her that he would not, Rogers began to fondle her. As Sikes retreated, Rogers told her that she would have to make it up to him. Rogers grabbed her breasts and asked Sikes whether she was wearing any underwear.

Before Sikes could answer, Rogers lifted Sikes's top, pulled out her pants, and stuck his hand inside. As he was touching her, he stated that he wanted her "on his finger" so he could taste her on his way home. After he pulled out his hand from inside her pants, he licked his finger and told Sikes that she tasted sweet.

The following day, Rogers called Sikes and told her he was coming to her dormitory room before beginning work. Sikes immediately called and went to the GPPD station to report the incident and was informed that Rogers had had three other complaints lodged against him. Rogers went to Sikes's dormitory room that night.

When compiling his report on the Sikes incident, Rogers denied ever having touched her. After an internal investigation, however, he admitted to Sikes's charges. He was thereby placed on indefinite suspension and charged

with criminal official oppression, to which he pleaded guilty.

## II.

Plaintiffs filed their § 1983 claims against the city, Crum, and Lieutenant Bender, the officer in charge of the Department of Internal Affairs at GPPD. The district court granted summary judgment for the City on qualified immunity grounds. We vacated and remanded on the ground that the district court had applied incorrect legal standards to the evidence submitted by the plaintiffs. *See Gros v. City of Grand Prairie*, 181 F.3d 613, 615-16 (5th Cir. 1999).

Crum and Bender moved for summary judgment on qualified immunity grounds. The district court granted Bender's motion as to all claims asserted against him; these rulings are not being appealed. The court granted Crum's motion with respect to the claims that he maintained an improper hiring policy and that he improperly trained and supervised Rogers. The court denied Crum's motion as to his act of hiring Rogers.

All the losing parties with respect to the claims against Crum appeal these rulings. Although they recognize that the grant of summary judgment on two of their three claims is an interlocutory order that is typically not immediately appealable, plaintiffs urge us to exercise our pendent appellate jurisdiction over those claims that they allege are "inextricably intertwined" with the deliberate-indifference-in-hiring claim.

## III.

On the issue of qualified immunity, Crum asserts that plaintiffs presented insufficient evidence that he was deliberately indifferent to their constitutional rights in hiring Rogers. Plaintiffs respond by pointing to evidence that the district court concluded created an issue of material fact properly presented to the jury.

We first must determine whether plaintiffs have alleged a violation of a clearly established constitutional right, before we reach the narrower issue of qualified immunity. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Here, plaintiffs allege that Crum was deliberately indifferent to their constitutional rights to be free from false arrest, illegal search and seizure, excessive force, sexual harassment, and sexual assault.

Under *Board of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997), "deliberate indifference" to the "known or obvious consequences" of a hiring decision can amount to a constitutional violation on the part of the decision maker, but "[a] showing of simple or even heightened negligence will not suffice." Thus, "deliberate indifference" exists where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights. *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998), *cert. granted*, 525 U.S. 1097, *and cert. dismissed*, 119 S. Ct. 1493 (1999). There must be a strong connection between the background of the particular applicant and the specific violation alleged. *Brown*, 520 U.S. at 412. Accordingly, plaintiffs cannot succeed in defeating summary judgment merely because there was a probability that a poorly-screened officer would violate their protected rights; instead, they must show that the hired

officer was highly likely to inflict the particular type of injury suffered by them. *Id.*

Because the district court denied summary judgment on this claim, we are limited to a review of whether the factual issues on which the district court based its decision were material, and we are precluded from reviewing the district court's determination that the issues of fact in question are genuine.[1] As evidentiary support for their contention that there was a material issue of fact whether Crum was deliberately indifferent to their constitutional rights in hiring Rogers, plaintiffs rely primarily on the contents of Rogers's pre-employment personnel file. They point to (1) reports from his previous employment as a police officer for the University of Texas at Arlington ("UTA") that indicated that Rogers went to a psychologist after being involved in back-to-back incidents where force was used; (2) statements from a UTA supervisor that if the GPPD hired Rogers, they would have to "monitor his activities and guide him in the direction [they] want to go"; (3) a psychological test done for entry into UTA that indicated Rogers was inflexible, too defensive, and unwilling to take direction conflicting with his own desire; (4) a letter of reprimand issued to Rogers for losing another officer's location; (5) a letter of reprimand for insubordination for refusing to sign a report; (6) a complaint against Rogers for being harassing and overbearing during a traffic stop (The overbearing complaint was sustained, but the harassment complaint was not.); (7) an unsustained complaint that Rogers was threatening and unprofessional and improperly drew his weapon during a traffic stop; (8) an

evaluation that Rogers was "unable to take criticism, he disregarded supervision and didn't adhere to dept policies"; (9) statements by another officer that Rogers was "a little rash in his demeanor and his personality tended to aggravate a situation" and "was almost to the point of being badge heavy;" (10) comments that Rogers "needs to know the difference between escalating and when not to," that "he is at times [too] quick to draw his weapon," that "when he reacts too fast he usually reacts in an aggressive manner," and that "with his take-charge attitude, sometimes Rogers overdoes it"; and (11) information that during high school, the principal suspended Rogers for continuing to talk to a girl who had rebuffed his advances.

To defeat summary judgment, the proffered evidence must be sufficient to create an issue of material fact whether a reasonable officer would conclude that the obvious consequence of hiring Rogers would be that he would sexually harass, sexually assault, falsely arrest, use excessive force, or illegally search or seize a third person. In other words, the evidence must demonstrate that Crum was deliberately indifferent to this obvious consequence.

This court has recently noted that *Brown* is instructive as to the quantum and quality of evidence of deliberate indifference that is necessary:

> There, Reserve Deputy Stacy Burns ("Burns") stood convicted of using excessive force when he wrested a woman from a car, badly damaging her knees in the process. Burns, who was the great-nephew of Sheriff Moore, Bryan County's Sheriff and policy-maker, had a criminal record that included arrests for driving while intoxicated, driving with a

---

[1] *See Colston v. Barnhart*, 146 F.3d 282, 284 (5th Cir.) (on suggestion for rehearing en banc), *cert. denied*, 525 U.S. 1054 (1998).

**4**

suspended license, resisting arrest, public drunkenness, and a conviction for assault and battery. Looking at this record, the Supreme Court held that Sheriff Moore's failure to examine Burns's criminal record did not "reflect[] a conscious disregard for a high risk that Burns would use excessive force in violation of respondent's federally protected right."

*Aguillard v. McGowen*, 2000 U.S. App. LEXIS 3884, at *10 (5th Cir. Mar. 15, 2000) (quoting *Brown*, 520 U.S. at 415-16). In *Aguillard,* the deputy officer, Joseph McGowen, was convicted of murder for a shooting committed while he was on duty. McGowen's record showed, among other things, that he had previously threatened the mother of a juvenile with arrest, that he meddled in this mother's supervision of the child while he was off duty, that colleagues at the police department reported that he wanted to "ride where the women were," that a female colleague stated that she did not want to ride with him under any circumstances, and, most importantly, that there was a report that he had assaulted and pistol-whipped a teenage boy who was driving his car around McGowen's apartment complex, though McGowen was neither arrested nor convicted of the alleged assault. McGowen's informal disciplinary record included infractions for using police radio for broadcasting personal messages and for refusing to convey information to one party in a vehicular accident.

Presented with this evidence in support of the denial of the county's motion for judgment as a matter of law, the *Aguillard* court nevertheless reversed, reasoning that "McGowen had never wrongfully shot anyone before, nor did his record reveal him to be

likely to use excessive force in general or possess a trigger-happy nature in particular." *Aguillard*, 2000 U.S. App. LEXIS 3884, at *12. Thus, the court concluded that "[w]hile the County may have been negligent in its employment decision, the magnitude of its error does not reach constitutional cognizance." *Id*.

Likewise, in the instant case, the evidence presented by plaintiffs does not rise to the level of a constitutional violation. To be sure, there are scattered statements in Rogers's pre-employment file that suggest he was sometimes too aggressive for UTA's campus police department. There are also letters of reprimand and sustained complaints for being overbearing and abusive during a traffic stop. But while these facts suggest that Crum, like the county in *Aguillard*, might have been negligent in failing adequately to review Rogers's records and in ultimately deciding to hire him, they do not provide sufficient evidence of a deliberate indifference to constitutional rights.

Rogers had never sexually assaulted, sexually harassed, falsely arrested, improperly searched or seized, or used excessive force against any third party. Indeed, the record reflects that he never committed a serious crime. Just as in *Aguillard*, the incident in Rogers's past that was potentially most damaging to his recordSSthe complaint for an alleged improper drawing of his weapon during a traffic stopSSwas not sustained by UTA. And the reprimands and complaints that *were* sustained do not meet *Brown*'s requirement of a "strong" causal connection between Rogers's background and the specific constitutional violations alleged. *See Brown*, 520 U.S. at 412. Instead, those reprimands related to insubordination for refusing to sign

a report and for losing track of an officer on patrol.

Moreover, in reviewing the record we consider the context of Rogers's colleagues' statements about the need further to "monitor" him and to the effect that he might be too "aggressive," "almost badge heavy," and "a little rash in his demeanor." Without exception, the UTA officers who made these statements also had positive things to say about Rogers and ultimately recommended him as a good hire.

For instance, the officer who noted Rogers's problems with being aggressive, reacting too fast under stress, and that he was "too quick to draw his weapon," also concluded that he "would be a good officer, but the above problems need to be addressed," and characterized Rogers as "a real aggressive, professional officer, a real go-getter, who gets the job done." Significantly, this officer's personal reference for Rogers was the worst one.

Another officerSSthe one who suggested that Rogers would have to be monitored by GPPD, and who brought to light Rogers's interview with a psychologist after he was involved in "back to back incidents" of forceSSnoted that Rogers voluntarily went to the psychologist because it was department policy that anyone involved in a couple of incidents of force must do so. The officer concluded, however, that "Rogers is a good cop," "the kind that any department would want."

Several of the officers who noted Rogers's aggressiveness merely thought it was inappropriate for the campus environment in which he worked. Those officers felt that Rogers would benefit from being placed in a larger police department, and they too recommended him as a good officer. In addition, Rogers's personnel file reflected that he had received good evaluations since becoming a UTA police officer, and three of those evaluations placed him above average. Two other officers who served as Rogers's personal references had only positive things to say about him.

In the end, the evidence in Rogers's personnel file was, at worst, mixed. If mere negligence were enough to sustain a claim against Crum, we might be presented with a closer case, though the positive feedback still seems to outweigh the negative. That evidence is insufficient, however, to demonstrate constitutional deliberate indifference on Crum's part, because it does not establish a strong causal connection between Rogers's background and the particular constitutional violations asserted.

With the benefit of hindsight, it is apparent that Rogers was a bad hire, but there is insufficient evidence to show that Crum was deliberately indifferent to plaintiffs constitutional rights when he made his hiring decision. Consequently, there are no issues of fact that warrant a jury determination, because the evidence presented is not material in light of *Brown* and *Aguillard*, and the district court should have granted Crum summary judgment on this claim.

IV.

Plaintiffs also asserted claims against Crum for failure adequately to train and supervise Rogers and for having a hiring policy that allowed persons with a propensity toward violent behavior into the GPPD. Because the district court granted summary judgment to Crum based on his qualified immunity on both of these claims, and because the court denied

summary judgment on plaintiffs' deliberate-indifference-in-hiring claim, plaintiffs properly recognize that the appeal of summary judgment on these two claims is an interlocutory appeal not typically immediately reviewable by this court.

Nevertheless, plaintiffs urge us to assert jurisdiction for these cross-appeals using pendent appellate jurisdiction. They argue that such jurisdiction is justified because the facts and legal issues of these two claims are "inextricably intertwined" with those of the appealable order denying summary judgment. They also assert that our exercise of pendent appellate jurisdiction would promote judicial economy by providing both parties with a speedy resolution of the entire case.

Pendent appellate jurisdiction should be exercised only in "rare and unique" circumstances. *Woods v. Smith*, 60 F.3d 1161, 1166 n.29 (5th Cir. 1995). Plaintiffs assert that these are such circumstances, because all three of their claims are inextricably intertwinedSSthey arise from the set of facts, and all concern the employment practices operated by Crum at different levels of specificity. For instance, plaintiffs' claim against Crum for failure adequately to train and supervise Rogers flows from Crum's alleged disregard for the same information in Rogers's pre-employment file that gave rise to the deliberate-indifference claim. Also, plaintiffs' claim challenging Crum's hiring policy merely recasts the deliberate-indifference-in-hiring claim at a higher level of generality; that is, it challenges *all* hiring decisions made pursuant to the policy, rather than the individual decision to hire Rogers.

But despite the fact that these claims do overlap, they were treated separately by the district court; each has unique elements and relevant facts. The claim for inadequate training and supervision, for example, relies heavily on a GPPD psychologist's evaluation that Rogers "has a tendency to be apprehensive and may be tense and driven which may require further [scrutiny] by his field training officer." This evidence was not in Rogers's pre-employment file from UTA and is not relevant to Crum's initial decision to hire Rogers. Similarly, the claim challenging Crum's general hiring policy requires much more evidence of systemic problems, beyond the single decision to hire Rogers. Consequently, much of the evidence necessary for the hiring-policy claim is not relevant to the denial of summary judgment on the deliberate-indifference-in-hiring claim.

As their closest relevant case, plaintiffs' rely on *Morin v. Caire*, 77 F.3d 116 (5th Cir. 1996), in which we exercised pendent appellate jurisdiction in a qualified immunity case, noting that "[i]n the interest of judicial economy, this court may exercise its discretion to consider under pendent appellate jurisdiction claims that are closely related to this [denial of summary judgment] issue properly before us." *Id.* at 119. *Morin* does not support the exercise of that discretion here.

In *Morin*, the court properly had before it the appeal of the denial of a qualified immunity defense on plaintiffs' § 1983 claims. Plaintiffs also asserted related state law claims that were not subject to the "exception" allowing immediate appeal of the denial of qualified immunity. In justifying its decision to exercise pendent appellate jurisdiction over these state law claims, the court noted:

Although we generally exercise this

power with caution, it is appropriate for us to do so in this situation, for if we were to refuse to exercise jurisdiction over the state law claims, *our refusal would defeat the principal purpose of allowing an appeal of immunity issues before a government employee is forced to go to trial*.

*Id.* at 119-20 (emphasis added) (footnotes omitted).

Here, unlike the circumstance in *Morin*, declining pendent appellate jurisdiction over the claims for which summary judgment was granted in favor of Crum would not defeat the purposes of qualified immunity. Instead, as the public employee who prevailed on his qualified immunity defense, Crum is not being forced to trial on those claims. Consequently, we are not presented with the "rare and unique" circumstances in which we might exercise our pendent appellate jurisdiction, and we decline to do so.

The order denying summary judgment is REVERSED, the cross-appeal is DISMISSED for want of jurisdiction, and this matter is REMANDED.