# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 24, 2012

No. 10-20634

Lyle W. Cayce
Clerk

WESTLAKE PETROCHEMICALS, L.L.C.,

Plaintiff-Appellee-Cross-Appellant

v.

UNITED POLYCHEM, INC.,

Defendant-Appellant-Cross
Appellee

LYNN VAN DER WALL,

Defendant-Cross Appellee-
Appellant

Appeals from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and WIENER and GRAVES, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellants-Cross-Appellees United Polychem, Inc. ("UPC") and Lynne Van Der Wall ("Van Der Wall") (collectively, "Appellants") and Plaintiff-Appellee-Cross-Appellant Westlake Petrochemicals, L.L.C. ("Westlake") appeal different results of a jury trial. At the core of that trial was an agreement between UPC as buyer and Westlake as seller of ethylene, a petroleum product. The jury found that (1) the parties had formed a binding contract, (2) UPC

No. 10-20634

breached that contract, and, as a result, (3) UPC was liable to Westlake for $6.3 million in actual damages and $633,199.67 in attorneys fees. The district court entered a final judgment in which it awarded Westlake damages and attorney's fees against UPC under the jury's verdict and also held Van Der Wall jointly and severally liable under the terms of a guaranty agreement (the "Guaranty"). UPC and Van Der Wall appeal those aspects of the jury verdict and the district court's ruling, contending that (1) a binding contract was not established, (2) the district court did not apply the correct measure of damages, and (3) Van Der Wall is not jointly and severally liable for the jury verdict under the terms of the Guaranty. We affirm in part and reverse and remand in part.

## I. Facts & Proceedings

### A. Facts

UPC is a distributor of petrochemicals and plastics. In 2008, it sought to enter the market for ethylene, a petroleum product used in making plastics, with the intention of buying and reselling the compound. To facilitate UPC's acquisition of ethylene, Van Der Wall, as UPC's President, gave permission to a bilateral broker, Lawson Brice,[1] to bid for five million pounds of ethylene per month during calendar year 2009 at a fixed price of $0.54 per pound. On July 2, 2008, Brice matched UPC's bid with an offer from Westlake, and Westlake agreed to the transaction, subject to credit approval.

Under industry custom, after a bilateral broker matches a bid with an offer, the broker "lifts the veil," revealing the buyer's and seller's respective identities to one another. It is at this point that a deal is considered to be "done," *i.e.*, the parties have reached an agreement. The broker typically sends a

---

[1] A bilateral broker acts as an intermediary in the market, representing a bid to buy and an offer to sell. According to Brice's testimony, bilateral brokers are "neutral intermediar[ies]" and do not "take title to any materials . . .[and] do not have an incentive to see the price go up or down."

2

No. 10-20634

written confirmation to each party notifying them that the deal is done, meaning that there is a contract. Following the lifting of the veil, the parties have a brief window of time during which either may cancel the transaction, with or without any grounds.[2]

After matching UPC's bid with Westlake's offer on July 2, 2008, Brice sent an instant message to Westlake's Chief Financial Officer, Bryan Chappelle, informing him that the deal was done. Brice also sent Chappelle an email that same day stating "Please find your attached confirmation (pending credit with UPC)." That attachment identified the product and stated the price, the volume, and the method, time, and place of delivery. Brice also sent Van Der Wall an email setting out the same transactional terms and stating " . . . please accept this email as a 'pre-confirmation,' detailing today's transaction."

At trial, Brice testified that his email to Van Der Wall was in fact a confirmation of the deal that he had brokered that afternoon. He further testified that he had used the term "pre-confirmation" because his company had decided to delay billing UPC for the transaction because UPC was to pay additional fees for access to an exchange market of buyers and sellers of ethylene. Westlake presented additional testimony at trial indicating that parties to such transactions typically negotiate specific credit arrangements after a contract has been reached, usually about one or two months before shipment.

Neither party cancelled the transaction either immediately or within five days after the veil was lifted on July 2, 2008. Instead, they began negotiating credit terms and planning for performing the transaction. UPC's Chief Financial Officer, Mark Selawski, sent credit references and banking and financial

---

[2] Westlake and the Appellants presented different interpretations of how long this period lasts: Westlake insists that this period typically lasts no more than a day; Appellants contend that it may last up to five days.

information to one of Westlake's credit analysts, Leticia Aleman. Concurrently, Westlake began purchasing ethane, the feedstock for ethylene, for the dual purposes of fulfilling its obligation to UPC and supplying one of its subsidiaries with ethylene.

After reviewing UPC's financial information, Westlake rejected "open credit" for UPC whereby it would simply deliver the ethylene and await payment. In response, UPC proposed that Van Der Wall would execute a personal guaranty as security for UPC's credit. It was at this point that Westlake provided a printed guaranty form to Van Der Wall which Westlake had drafted. It stated that Van Der Wall is responsible for:

> all liabilities or obligations of [UPC] whether from invoices, promissory notes, drafts, checks, and all other charges, which may now be outstanding or owing from, or which may be incurred hereafter by [UPC] to [Westlake]. . .

Westlake's form also states that Van Der Wall has the right to terminate the Guaranty on 30 days' written notice, and that, on such termination, Van Der Wall:

> shall not be responsible for any indebtedness created or incurred by [UPC] hereafter, but shall remain liable hereunder for any indebtedness created or incurred by [UPC] prior to such termination.

Van Der Wall signed the guaranty form and returned it to Westlake on July 23, 2008.

In August, Westlake rejected extending credit to UPC based on the Guaranty alone. On September 22, 2008, Selawski sent an email to Aleman proposing to secure UPC's credit with a $2 million letter of credit in addition to Van Der Wall's Guaranty. On October 3, 2008, Aleman updated Westlake's system with the proposal. She testified that she left Selawski a voicemail message requesting that UPC open the letter of credit before the first shipment

and inquiring about the bank that would issue the letter of credit. Selawski testified that he never received that message.

Westlake presented evidence indicating that the market price for ethylene dropped sometime in the fall of 2008, thus turning against UPC's ethylene position. On October 30, 2008, Chappelle sent an email to Van Der Wall, informing him that Westlake was setting up billing in its system for the sale. Van Der Wall replied, "[w]e never closed the deal. We were not approved for credit." On November 4, Westlake contacted UPC to inform it that Westlake had approved UPC's credit on the terms of Selawski's September 22 offer of security and sought assurance of performance on the contract. Later that day, Van Der Wall informed Westlake that UPC would not perform under the contract because Westlake had not confirmed credit. After UPC repudiated, Westlake decided not to proceed with acquiring ethylene from a supplier in anticipation of delivering ethylene to UPC, although it had procured ethane, the feedstock of ethylene, for the purpose of supplying one of its subsidiaries in addition to meeting its obligation to UPC.

Westlake filed this suit in state court on November 10. On December 10, 2008, Van Der Wall formally notified Westlake, through his attorney, that he was terminating his Guaranty. The Guaranty's termination took effect thirty days later, on January 9, 2009.

## B. Proceedings

As noted, Westlake filed suit in state court against UPC and Van Der Wall on November 10, 2008, claiming that UPC breached its contract by refusing to perform and that Van Der Wall breached the Guaranty by refusing to satisfy UPC's obligations. UPC removed the case to federal court under diversity jurisdiction pursuant to 28 U.S.C. § 1332 and counterclaimed that Westlake had breached the agreement.

No. 10-20634

At the conclusion of a two-week trial in April 2010, the jury found that UPC and Westlake had formed a binding contract in July of 2008 and that UPC had breached that contract. The jury awarded Westlake $6.3 million in damages and $633,199.67 in attorneys fees. The jury did not decide whether Van Der Wall had breached the Guaranty because the parties had agreed to have the presiding judge decide this issue.[3]

The district court entered a Final Judgment in which Westlake was awarded damages and attorneys fees pursuant to the jury verdict. The district court later entered an Amended Final Judgment in which it awarded interest to Westlake and held that Van Der Wall was jointly and severally liable under the Guaranty for the full amount of the award.

Appellants now appeal the jury verdict and the district court's judgment, asserting that (1) they and Westlake never formed a binding contract, (2) the district court did not apply the correct measure of damages, and (3) Van Der Wall is not jointly and severally liable with UPC under the Guaranty. Westlake conditionally cross-appeals, asserting that the district court had jurisdiction to enter its Amended Final Judgment, and Appellants agrees with Westlake's position.[4]

---

[3] Both parties agreed that there were no factual disputes with respect to the Guaranty and that the district court could decide the issue as a matter of law.

[4] After the jury rendered its verdict, the district court initially entered a Final Judgment, awarding Westlake damages pursuant to the jury verdict and attorneys fees. The district court did not reach the issue of Van Der Wall's liability at that time. The district court subsequently issued an Amended and Final Judgment in which it held that Van Der Wall is jointly and severally liable with UPC under the Guaranty. Westlake conditionally appealed in the event that we decide that the district court did not have jurisdiction to enter its Amended and Final Judgment, and therefore did not have jurisdiction over the issue of whether Van Der Wall was indeed liable under the Guaranty. UPC and Van Der Wall agree with Westlake's position. We conclude, as all parties now agree, that the district court did have jurisdiction to enter its Amended Final Judgment, as its Final Judgment was interlocutory. "[A]ny order or other decision [by the district court judge]...that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action...and may be revised at any time before the entry of a judgment adjudicating all the

6

No. 10-20634

## II.  UPC and Westlake's Contract

### A.  Standard of Review

"Whether a particular agreement is an enforceable contract is a question of law reviewed *de novo*."[5]  Even though the question whether an agreement is legally binding is a question of law, whether an agreement was reached at all is a question of fact.[6]

In this case, the jury made a factual determination that the parties intended to bind themselves to a contract. This court is "wary of upsetting jury verdicts," and, accordingly, "[a] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did."[7] Furthermore, "we are bound to consider the evidence and all reasonable inferences therefrom in the light most favorable to the jury verdict."[8]  Finally,

---

claims..."  FED. R. CIV. P. 54(b).

[5] *Martin v. Martin*, 326 S.W.3d 741, 747 (Tex. App.–Texarkana 2010).  Because UPC removed this case to federal court pursuant to diversity jurisdiction, Texas substantive law applies.  *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).  To determine issues of state law, we look to final decisions of the state's highest court, and when there is no ruling by that court, then we have the duty to determine as best we can what the state's highest court would decide. *Transcon. Gas Pipeline Corp. v. Transp. Ins. Co.,* 953 F.2d 985, 988 (5th Cir. 1992) (citations omitted).

[6] *Quanta Servs. Inc. v. Am. Admin. Grp. Inc.*, 384 F. App'x 291, 296, No. 08-20252, 2008 WL 5068804 (5th Cir. Dec. 2, 2008) (unpublished) (citing *Komet v. Graves*, 40 S.W.3d 596, 601-02 (Tex. App.– San Antonio 2001, no pet.)).

[7] *Travelers Cas. and Sur. Co. of America v. Ernst & Young LLP*, 542 F.3d 475, 481-82 (5th Cir. 2008) (citation and internal quotation marks omitted).

[8] *Haley v. Pan Am. World Airways, Inc.*, 746 F.2d 311, 317 (5th Cir. 1984) (citing *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir.1969)).

No. 10-20634

"[w]e must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable."[9]

Appellants have presented a number of arguments why a binding contract was not formed between UPC and Westlake. We address each of these below.

## B. Analysis

### 1. Mutuality of Obligation

Appellants contend that UPC's agreement with Westlake lacked consideration and cannot be enforced. Specifically, Appellants assert that there was no mutual obligation between the parties because Westlake retained the unilateral discretion to subject delivery to its approval of UPC's credit, which it never did. According to Appellants, therefore, Westlake's promise under the agreement was illusory; and, because Westlake was not truly bound to perform, its agreement is not an enforceable contract under Texas law.

"Consideration is a present exchange bargained for in return for a promise."[10] "It consists of either a benefit to the promisor or a detriment to the promisee."[11] "A promise is illusory if it does not bind the promisor, such as when the promisor retains the option to discontinue performance."[12] Such illusory promises, therefore, lack mutuality of obligation and do not constitute a contract.[13]

---

[9] *Rideau v. Parkem Indus. Servs., Inc.*, 917 F.2d 892, 897 (5th Cir. 1990) (citing *Glass v. Petro-Tex Chem. Corp.*, 757 F.2d 1554, 1559 (5th Cir.1985)).

[10] *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (citing *Connell v. Provident Life & Accident Ins. Co.*, 224 S.W.2d 194, 196 (1949)).

[11] *Id.* (citation omitted).

[12] *In re 24R, Inc.* 324 S.W.3d 564, 567 (Tex. 2010).

[13] *Id.*

No. 10-20634

In this case, the jury found that Westlake and UPC intended to form a binding contract. Although we note that Appellants refer — out of context — to various statements made by witnesses during the trial that some such deals are "subject to credit approval," we can find no testimony or other record evidence indicating that Westlake had the unilateral right to rescind the contract without being subject to a breach of contract claim. By contrast, Westlake adduced evidence at trial that a deal such as this becomes binding once the "veil is lifted" and no party rejects the counterparty during a short period of time that follows. Westlake also presented testimony that industry custom permits specific additional terms, such as payment and credit, to be worked out after formation of the buy and sell contract.

Van Der Wall gave Brice permission to enter a bid for ethylene on behalf of UPC. Brice matched UPC's bid with Westlake's offer. It is undisputed that neither party timely objected after the veil was lifted. Thus, a binding contract was formed. Furthermore, any contention that the deal was subject to a condition precedent of UPC providing credit acceptable to Westlake lacks merit because, as further discussed below, the record makes clear that the condition of obtaining acceptable credit was at most a condition precedent to *performance*, not to the formation of the contract.[14]

Having determined that there is a "legally sufficient evidentiary basis" for the jury to have concluded that the parties formed a binding contract, we will not disturb the jury's verdict on the basis of Appellants' assertion that the contract lacked consideration.

## 2. Statute of Frauds

---

[14] *See Crest Ridge Constr. Grp., Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996) (upholding jury verdict and noting that, based on dealings between the parties, the jury could have concluded that "subject to credit department approval" language in price quotation was a condition precedent to performance, not to contract formation).

No. 10-20634

Appellants assert that the agreement fails to satisfy both the Texas and the Uniform Commercial Code's ("UCC") statutes of frauds because (1) the written confirmations of the deal failed to contain any agreement on UPC's credit, an essential element of the agreement, and (2) Brice was not authorized to bind UPC in a contract. We now address each of these points.[15]

### a. Credit as an essential element

Appellants insist that credit was essential to UPC's agreement with Westlake, so that the putative contract does not satisfy either the UCC or the Texas statutes of frauds. Under the UCC, the only essential term that must be contained in a written agreement for the sale of goods over $500 is the quantity. Specifically, the UCC statute of frauds's writing requirement states:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.[16]

In addition, a comment to this provision states:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. *The only term which must appear is the quantity term* which need not be accurately stated

---

[15] Westlake asserts that, to the extent that the Texas statute of frauds conflicts with the UCC, the UCC preempts the state statute. Because we find that the agreement meets the requirements of both provisions, we do not address this issue.

[16] TEX. BUS. & COM. CODE ANN. § 2.201(a) (Vernon 2003).

No. 10-20634

but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.[17]

In this case, the written confirmations sent by Brice to both parties by instant message and email immediately after the deal was "done" meet the requirements of the UCC's statute of frauds.[18] These confirmations included the essential quantity provision (5 million pounds per month), as well as the price ($0.54 per pound), the product (ethylene), and the delivery terms (monthly during the 2009 calendar year, delivered via pipeline to Mont Belvieu-Williams). Regardless of the credit term, the UCC's statute of frauds writing requirement was met in this case.

The agreement between UPC and Westlake also satisfies the Texas statute of frauds.  The Texas general statute of frauds requires "[a] promise or agreement... or memorandum...[to be] in writing; and signed by the person to be charged with the promise or...by someone lawfully authorized to sign for him."[19] The writing also must contain "all of the essential elements of the agreement so that the contract can be ascertained from the writing . . ."[20]  As previously discussed, we are satisfied that UPC did not present any evidence at trial (or pointed to any on appeal) which firmly establishes that credit terms were

---

[17] TEX. BUS. & COM. CODE ANN. § 2.201(a) cmt.1 (Vernon 2003) (emphasis added); *see also* § 2.204(a) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.")

[18] *Den Norske Stats Oljeselskap, A.S, v. Hydrocarbon Processing Inc.*, 992 F. Supp. 913, 914-15 (S.D. Tex. 1998) (holding that the broker's confirming memoranda "reliably evinces agreement."), *aff'd*, 161 F.3d 8, No. 98-20190, 1998 WL 723858 (5th Cir. Oct. 6, 1998) (unpublished).

[19] TEX. BUS. & COM. CODE ANN. § 26.01 (Vernon 2005).

[20] *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978) (citation omitted).

"essential" to the contract. In fact, trial evidence indicates that the industry norm is to negotiate payment and credit terms *after* formation of the contract. Therefore, the writing requirement of the Texas statute of frauds was met in this case.

### b. Brice's Authority

Appellants also contend that the contract violated the statutes of frauds because Westlake did not obtain a specific jury finding that Brice had authority to bind UPC to a contract. Appellants concede, however, that there is evidence showing that Van Der Wall authorized Brice to agree to price, quantity, delivery, and location terms.

We agree with Westlake that the jury properly found that Brice was authorized to bind UPC to a contract. The jury heard Van Der Wall's testimony that he authorized Brice to bid $0.54 per pound for 5 million pounds of ethylene per month. The jurors also heard Brice testify that he was authorized to do so by Van Der Wall. At the least, this evidence shows that Brice was authorized to enter into a binding contract under both the UCC and Texas state statutes of frauds. Brice was authorized to agree to quantity, the only essential term under the UCC. And, as we have already concluded, credit was not an essential term. Therefore, the agreement meets the requirements of both statutes of frauds.

### 3. Condition Precedent

Lastly, Appellants claim that the only reasonable view of the trial evidence is that Westlake's approval of credit for UPC was a condition precedent to the formation of a final, binding contract. We disagree.

As discussed above, the evidence in the record does not firmly establish that the parties intended the credit issue to be a condition precedent to the contract. Appellants repeatedly point to phrases such as "subject to" approval of credit and "pending credit" contained in Brice's confirmations in an effort to support their contention that credit was a condition precedent to a binding

contract. At trial, however, Brice testified that such notations were merely reminders that credit would need to be worked out between the parties. He stated that it is industry custom to work out credit details closer to performance, well after a deal is reached. Brice also explained that his reference to credit meant that both parties had the right to reject the counterparty at the moment the "veil was lifted." Yet, neither party objected after the veil was lifted. After the time for objecting lapsed, a binding contract was established. The credit term simply was not a condition precedent to the formation of a binding contract.

More sensibly, the credit issue was related to a pre-condition to Westlake's *performance*. "A condition precedent to an obligation to perform [ ] does not prevent contract formation, but does prevent a duty to perform from arising except upon realization of the condition. As such, a condition precedent to an obligation to perform may be one of several terms of an already formed contract."[21] We conclude that Westlake and UPC did indeed form a binding contract when neither objected following the lifting of the veil.

### III. Damages

### A. Standard of Review

We review a district court's ruling regarding a proper measure of damages *de novo*. [22]

### B. Analysis

---

[21] *Crest Ridge Constr. Grp., Inc.*, 78 F.3d at 150 (citation omitted).

[22] *Lubke v. City of Arlington,* 455 F. 3d 489, 498 (5th Cir. 2006) (citation omitted). We note that Westlake contends that the Appellants have waived their argument as to the correct measure of damages by not raising it in a Rule 50(a) motion. UPC and Van Der Wall raised this issue to the district court in open court before Westlake rested its case. The Appellants also renewed the issue in their Rule 50(b) motion. We conclude, therefore, that UPC and Van Der Wall have not waived this issue.

No. 10-20634

The determinative issue relating to the proper quantum of damages is whether to apply subsection (a) or subsection (b) of Tex. Bus. & Com. Code. § 2.708.  Subsection (a) states:

> Subject to Subsection (b) and to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this chapter (Section 2.710), but less expenses saved in consequence of the buyer's breach.

Subsection (b) states:

> If the measure of damages provided in Subsection (a) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this chapter (Section 2.710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

In this dichotomy, § 2.708(a) provides damages in the amount of the difference between the contract and the market price at the time and place of tender, and § 2.708(b) provides damages in the amount that the non-breaching party would have realized under the contract had the breaching party fully performed.  At trial, Chappelle testified for Westlake that its lost profits under the contract with UPC amounted to $2 million.  In contrast, Westlake's damages expert testified that the average price for ethylene in 2009 was 26.81 cents per pound, so that, applying this price, Westlake should be awarded $16.3 million in damages, *i.e.*, the difference between the contract price and the market price.

After discussion at trial, the district court agreed with Westlake to instruct the jury to award damages under § 2.708(a), the difference between contract and market prices.  Without elaboration or explanation, the jury awarded Westlake

14

No. 10-20634

$6.3 million in damages, and the district granted Westlake the jury amount $6.3 million in damages in its Final Judgment.

Appellants insist that the proper measure of damages in this case should be calculated pursuant to § 2.708(b). They emphasize that Westlake never actually purchased ethylene in anticipation of fulfilling the contract. According to Appellants, then, awarding more than Westlake's lost profit would constitute a windfall. Westlake counters that, before UPC breached the contract, Westlake purchased enough ethane, the feedstock for ethylene, to cover its obligation to UPC. To this, Appellants respond that Westlake purchased the ethane for a dual purpose: to make ethylene for UPC *and* to supply its own subsidiary.

We have previously ruled on this issue in a case involving similar circumstances. In *Nobs Chem., U.S.A., Inc., v. Koppers Co., Inc.*,[23] the plaintiffs contracted to sell cumene, a substance used in high octane motor fuel, to the defendant. The plaintiffs arranged to acquire cumene from a supplier. After the defendant repudiated the contract, however, the plaintiffs cancelled plans to acquire the cumene.[24] The district court determined that the plaintiffs were entitled to recover lost profits under § 2.708(b) as opposed to damages under § 2.708(a) because they had never actually acquired the cumene.[25]

In affirming, we noted that the UCC intends for § 2.708(b) to apply to particular types of sellers, one being a "jobber." A jobber is a seller who (1) never acquired the contracted goods, and (2) the seller's decision not to acquire those goods "after learning of the breach was not commercially unreasonable."[26] In applying subsection (b) in *Nobs*, we made special note of the fact that the

[23] 616 F.2d 212 (5th Cir. 1980).

[24] *Id*. at 214.

[25] *Id*.

[26] *Id*. (citation omitted).

15

plaintiffs in that case never acquired the goods from the supplier after they learned of the defendant's repudiation; thus, there could be no action for either the purchase price or resale.[27] Such a conclusion is commensurate with the basic UCC policy embodied in § 1.305(a), which provides that "the aggrieved party may be put in as good a position as if the other party had fully performed but not in a better position."[28]   Observing this underlying policy in our application of subsection (b), we stated:

> No one insists, and we do not think they could, that the difference between the fallen market price and the contract price is necessary to compensate the plaintiffs for the breach. Had the transaction been completed, their "benefit of the bargain" would not have been affected by the fall in market price, and they would not have experienced the windfall they otherwise would receive if the market price-contract price rule contained in s 2.708(a) is followed.[29]

The circumstances in *Nobs* are sufficiently similar to those of the instant case to warrant application of § 2.708(b), rather than § 2.708(a).   Westlake originally intended to procure ethylene from a supplier to meet its contractual obligation to deliver ethylene to UPC.   After UPC repudiated, Westlake reasonably chose not to acquire the ethylene.   Westlake's actions make it tantamount to a "jobber".   Although Westlake contends that it *also* purchased enough *ethane* to meet its obligation to UPC, this fact is inapposite because (1)

---

[27] *Id.*

[28] *Id.* at 215 (citing to former § 106(a)).   Texas case law follows the same philosophy. *See Little Darling Corp. v. Ald, Inc.*, 566 S.W.2d 347, 349 (Tex. Civ. App. 1978). ("The measure of damages for breach of contract is the amount necessary to place plaintiffs in a financial position equivalent to that in which it would have had if the contract had been fully performed by both parties.")

[29] *Id.*; s*ee also Diversified Energy, Inc., v. Tenn. Valley Auth.*, 339 F.3d 437, 445-46 (6th Cir. 2003) (discussing the contract and market price differential and holding that "[a] non-breaching party is entitled to be placed in the same position it would have enjoyed had the defendant abided by the contract, but is not entitled to more than the benefit of his bargain.")

the parties contracted for the delivery of ethylene, not ethane, and (2) Westlake's acquisition of the ethane was also for the purpose of supplying one of its subsidiaries. We agree with Appellants that, under these circumstances, awarding Westlake more than the profit it would have made under the contract would constitute a windfall by placing it in a better position than if both parties had fully performed. As with the plaintiff in *Nobs*, had the instant transaction been completed, Westlake's "benefit of the bargain" would not have been affected by the fall in market price, and thus it would not have experienced the windfall it otherwise would receive if subsection (a)'s market price/contract price rule were followed.

We conclude that the proper measure of damages in this case is Westlake's lost profits under § 2.708(b). We therefore vacate the damages award as determined by the jury and accepted by the district court, and we remand this issue for the district court to calculate the damages under subsection (b).[30]

## IV. The Guaranty

### A. Standard of Review

A guaranty is, of course, a form of contract, and we review a district court's construction of any contract *de novo*.[31] At trial, the parties agreed that there were no fact issues regarding Van Der Wall's liability under the Guaranty.

---

[30] We decline to designate a specific amount of damages under § 2.708(b), as we note that, because the district judge instructed the jury to award damages under subsection (a), the jury was never able to consider evidence of "due allowance for costs reasonably incurred and due credit for payments or proceeds of resale" under subsection (b). We therefore remand this factual issue for a jury to determine in a new trial — or bench trial, in the event that all parties waive their right to a jury— limited to the quantum of damages to be awarded. *See Lubke v. City of Arlington*, 455 F.3d 489, 498-500 (5th Cir. 2006) (ordering damages award to be "revised or retried" after the district court instructed the jury to apply incorrect legal measure of damages); *see also Freedonia Broad. Corp., Inc. v. RCA Corp.,* 418 F.3d 781, 806 (5th Cir. 1973) (reversing and ordering new trial when, among other errors, the district court gave erroneous instructions for the legal measure of damages).

[31] *See Am. Nat'l Gen. Ins. Co. v. Ryan*, 274 F.3d 319, 323 (5th Cir. 2001) ("The district court's interpretation of an insurance contract is a question of law that we [ ]review de novo.")

No. 10-20634

Thus, the district court decided the issue whether Van Der Wall is bound under the Guaranty as a matter of law.

## B. Analysis

Van Der Wall advances a number of reasons why the Guaranty should not be interpreted to hold him jointly and severally liable with UPC for its breach of the ethylene purchase agreement. Specifically, Van Der Wall insists that (1) the Guaranty is a "continuing guaranty," meaning that it is not limited to a single transaction but contemplates a future course of dealing, spanning a number of transactions, until it is revoked or the underlying transaction is completed, (2) no debt had been incurred under the Guaranty at the time that Van Der Wall terminated it because Westlake had not shipped any ethylene to UPC as of January 9, 2009, (3) Westlake rejected the Guaranty when it failed to accept UPC's offered credit terms, (4) the Guaranty's language does not cover legal liability, and (5) the Guaranty was limited to one million dollars. Westlake counters that the Guaranty's language clearly renders Van Der Wall liable for the damages assessed to UPC under the terms of the jury's verdict. Although we note that, given the language of the Guaranty, several of Van Der Wall's arguments are without merit, we nonetheless conclude that the Guaranty's language is ambiguous as a matter of law, and it must therefore be strictly construed in Van Der Wall's favor.

In Texas, a guarantor is a "favorite" of the law, and a creditor's claim against a guarantor is strictly construed.[32] More specifically, a guarantor's obligation should not be extended by implication beyond the written terms of the

---

[32] *Joseph Thomas, Inc. v. Graham*, 842 S.W.2d 343, 346 (Tex. App. - Tyler 1992) (citation omitted).

guaranty, and any ambiguity must be construed in favor of the guarantor.[33]  In addition, any ambiguity is construed most strongly against the party who selected the language — here, Westlake.[34]

Westlake provided a printed guaranty form to Van Der Wall, which he signed and returned.  The Guaranty states that Van Der Wall is responsible for "all liabilities or obligations of [UPC] whether from invoices, promissory notes, drafts, checks, and all other charges, [1] which may now be outstanding or owing from, or [2] which may be incurred hereafter by [UPC] to [Westlake]. . ."  We note in passing that this language is similar to that contained in continuing guaranties.[35]  The Westlake document also provides that, on 30 days' written notice, the Guaranty is terminated and that, following termination, Van Der Wall "shall not be responsible for any indebtedness created or incurred by [UPC] hereafter, but shall remain liable hereunder for any indebtedness created or incurred by [UPC] *prior to* such termination."[36]  None dispute that Van Der Wall furnished written notice of termination to Westlake on December 10, 2008 and that the Guaranty terminated on January 9, 2009, before any delivery of ethylene from Westlake to UPC.

As noted above, most of Van Der Wall's arguments with respect to the Guaranty are without merit.  The language quoted above with respect to Van Der Wall's obligation as guarantor indicates that the Guaranty applies to the

---

[33] *Thompson v. Preston State Bank*, 575 S.W.2d 312, 315 (Tex. Civ. App. - Dallas 1978, writ ref'd n.r.e.) (citations omitted).

[34] *Id.* (citations omitted).

[35] *See Energico Prod. Inc. v. Frost Nat'l Bank*, 2012 WL 254093, *2 (Tex. App. - Fort Worth Jan. 26, 2012) (noting continuing guaranty stated it applied to amounts "now existing or hereafter arising or acquired, on an open and continuing basis."); *Grieg v. First Nat'l Bank of San Angelo*, 511 S.W.2d 86, 87 (Tex. Civ. App. 1974) (continuing guaranty covered amounts "concurrently herewith or hereafter made by Bank to Borrower").

[36] (emphasis added).

entire transaction between UPC and Westlake, and, despite the above noted similarities, likely is not a "continuing" guaranty; it is certainly not so designated either in the title or in the text of the document.[37]   Furthermore, Texas law deems the entire debt to be created at the moment that the contract is signed, meaning that UPC likely incurred the entire debt under its contract with Westlake on or about July 2, 2008, when the agreement was formed.[38]  And, it was after that when Van Der Wall signed the Guaranty.  Moreover, the record indicates that Westlake did not "reject" the Guaranty by not agreeing to other credit terms offered by UPC.  Neither does the language of the Guaranty itself condition its execution or its efficacy on Westlake's agreement to credit terms. Finally, the language of the Guaranty does not expressly limit the monetary amount of the personal guarantee.[39]

Nevertheless, even assuming that the Guaranty is not a continuing guaranty and that the entire debt was incurred at the inception of the underlying contract between Westlake and UPC, there is an irreconcilable internal conflict between the language establishing Van Der Wall's obligations and the termination provision of the document.  Specifically, assuming the Guaranty relates only to a single contract and a single transaction, such that the entire debt was incurred at the inception of the underlying contract, then the Guaranty's termination provision, with its express statement that Van Der Wall is not liable for any indebtedness incurred *after* he terminates the Guaranty by furnishing 30 days' written notice, is essentially meaningless surplusage.  Or,

---

[37] *See Id.*

[38] *Serna v. State,* 877 S.W.2d 516, 519 (Tex. App. - Austin, 1994); *see also Curry Auto Leasing, Inc. v. Byrd,* 683 S.W.2d 109, 112 (Tex. App. - Dallas 1984, no writ).

[39] *R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980) (citing *Citizens Nat'l Bank in Abilene v. Texas & P. Ry. Co.*, 150 S.W.2d 1003 (1941)) ("In the interpretation of contracts the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument.")

as insisted by Westlake, because the entire debt had already been incurred by UPC *before* Van Der Wall signed the Guaranty,[40] it would be impossible for any further debt to be created or incurred *after* termination; and such an impossibility renders this provision superfluous.[41]  Indeed, the Guaranty's termination provision is meaningless unless some debt could have been incurred by UPC after the inception of the contract and after termination of the Guaranty, which is in direct tension with other language in the document indicating that it is not a continuing guaranty.  We perceive no way to reconcile Westlake's position that Van Der Wall as guarantor became liable for the full amount of the contract from inception with the provision in the Guaranty furnished by Westlake that it may be terminated by the guarantor's furnishing of 30 days' notice.

Because of this irreconcilable conflict within the body of the form furnished by Westlake, we are convinced beyond cavil that the Guaranty is ambiguous as a matter of law.  If it is susceptible of any reasonable reading, it is susceptible of more than one: (1) Van der Wall's entire obligation under the Guaranty was incurred at the inception of the underlying contract *and* (2) because Van der Wall could terminate the Guaranty, his obligation was incrementally incurred,

---

[40]  Van Der Wall signed and returned the Guaranty on or around July 23, 2008, several days after the confirmation date of July 2, 2008.

[41]  After hearing this panel's questions at oral argument regarding the apparent contradiction in the Guaranty form, Westlake submitted a letter brief pursuant to Federal Rule of Appellate Procedure 28 (j) in which, for the first time, it contends that the Guaranty's "coverage of obligations 'which may be incurred hereafter by [UPC]' unambiguously extends the guaranty to *also cover subsequent contracts* UPC might enter into with Westlake." (emphasis added)  We note that this contradicts Westlake's position in its brief that "nothing in the guaranty suggests it is a continuing guaranty."  At the least, we view this as further indication that the Guaranty is ambiguous, *i.e.*, that its language can be read to mean that it either does or does not cover multiple transactions between UPC and Westlake.

as, for example, with each shipment of ethylene.[42]  As such, the Guaranty must be construed in Van Der Wall's favor,[43] with the result that his liability under the Guaranty must be limited to amounts, if any, due on shipments made prior to January 9, 2009 — and there were none.  Accordingly, we hold that, as guarantor, Van Der Wall is not jointly and severally liable with UPC.

## V.  Conclusion

The jury's verdict that UPC and Westlake formed a binding contract on or about July 2, 2008 is AFFIRMED.  The district court's award of damages under subsection (a) of TEX. BUS. & COM. CODE § 2.708 is REVERSED and VACATED, and the case is REMANDED for a new jury trial, limited to a determination of the appropriate quantum of damages and costs, calculated pursuant to subsection (b) of said § 2.708.  The district court's holding that Van Der Wall is jointly and severally liable with UPC for damages and costs is REVERSED with instructions that the final judgment on remand specify, *inter alia*, that Westlake take nothing from Van Der Wall.  This panel retains cognizance of the case for further appeals from the district court, if any, following this remand.

---

[42]  *Amigo Broad., LP v. Spanish Broad. Sys., Inc.,* 521 F.3d 472, 480 (5th Cir. 2008) (citation omitted) (under Texas law, contract is "ambiguous" only if, after application of established rules of construction, agreement is susceptible of more than one reasonable meaning).

[43]  *Thompson*, 575 S.W.2d at 315.