# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 22, 2025

Lyle W. Cayce
Clerk

No. 24-40481

Robert M. Loera,

*Plaintiff—Appellee*,

*versus*

Kingsville Independent School District,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:21-CV-31

Before Elrod, *Chief Judge*, and Higginbotham and Ramirez, *Circuit Judges*.

Per Curiam:

Gabriel Villarreal, a high school teacher employed by Defendant-Appellant Kingsville Independent School District, was convicted of online solicitation of a minor and attempted possession of child pornography. His victim, Plaintiff-Appellee Matthew Loera, sued KISD under 42 U.S.C. § 1983 and Title IX, alleging that the KISD board of trustees rehired Villarreal despite his history of forming inappropriate relationships with students.

No. 24-40481

The jury found for Loera on both claims and awarded him $250,000 in damages.  KISD now appeals the judgment.  Because the district court did not err in denying KISD's renewed motion for judgment as a matter of law as to Loera's § 1983 claim, we AFFIRM.

I

A

In 2008, KISD hired Gabriel Villarreal to teach theatre at H.M. King High School in Kingsville, Texas.[1]  Villarreal's father was a member of the school board in a neighboring town and, as a result, had known KISD trustee Corando Garza for many years.

While employed at H.M. King, Villarreal often went to parties with students, took them to restaurants, and bought them expensive gifts.  During his first year working at the school, Villarreal began texting and then flirting with one of his students, Arnulfo Cuellar.  This progressed into a sexual relationship.

Villarreal and Cuellar's relationship was not a well-kept secret in the community: they went to dinner with H.M. King's then-Assistant Principal Velma Salinas, and Cuellar accompanied Villarreal on vacations with his parents.  At least one teacher complained to "everybody" that it was inappropriate for Villarreal to be spending so much time with his students off campus, but "no one listened to her" because Villarreal's parents "knew school board members."  After Cuellar graduated from high school in 2011,

---

[1] "Because this appeal follows a jury verdict, we recount the facts 'in the light most favorable to the jury's determination.'"  *Wigginton v. Jones*, 964 F.3d 329, 332 (5th Cir. 2020) (quoting *Waganfeald v. Gusman*, 674 F.3d 475, 480 (5th Cir. 2012)).

2

Villarreal and Cuellar moved in together and made their relationship public on social media.

On September 14, 2010, Villarreal received a letter placing him on paid administrative leave until "facts [we]re known concerning [his] non-compliance" with district policies. On its face, the letter suggested that Villarreal had been placed on leave because his probationary teaching certificate had expired. But testimony at trial indicated that KISD sent the letter because someone had complained about his behavior with a student. Two days after Villarreal received the letter, KISD informed him that he could return to work because "[t]he results of [a preliminary] investigation [we]re inconclusive."

Villarreal left H.M. King in 2012 after he failed to pass his teaching certification exam. From 2012 to 2015, he taught theatre in neighboring Bishop Independent School District. In 2015, he reapplied for a teaching position at H.M. King, listing Salinas, who was no longer an Assistant Principal at the school, as a personal reference. On the reference check form that Salinas supplied, she stated that Villarreal "will be very involved where he is needed beyond his job description."

In summer 2015, KISD Superintendent Carol Perez met with the KISD board of trustees to discuss teacher candidates. She recommended that the board approve rehiring Villarreal "based on the recommendation of the campus principal and the interviewing committee." Two trustees, Lynn Yaklin and Melissa Windham, raised concerns about Villarreal. Yaklin, the mother of two children who had attended H.M. King during Villarreal's previous employment there, reported having heard rumors about his "inappropriate" relationships with students, including that he attended parties with them and taught his class how to put on a condom using a banana. Windham, who also had children who attended the school, reported hearing

rumors that Cuellar had graduated high school early in 2011 "so that he could pursue a relationship" with Villarreal.  Before the meeting, Windham had done a "quick Google search" of Villarreal's name and found a 2012 Facebook post that was "sexual in nature" indicating that Villarreal and Cuellar were "in a relationship together."  Windham believed that "[a]n educator probably should exercise a little more discretion on a public site."  The board discussed these concerns, including Villarreal's relationship with Cuellar, at length.

Based on these concerns, Superintendent Perez tabled Villarreal's candidacy and "went back and did some homework" on him.  According to Superintendent Perez's trial testimony, this "homework" included "look[ing] into [Villarreal's] records," contacting human resources personnel and legal counsel to see if they "had any history" on him, and calling BISD's assistant superintendent for a supplemental reference check.

The board of trustees met again on July 6, 2015, and Villarreal's candidacy was raised for a second time.  Superintendent Perez presented the results of her "homework" on Villarreal, sharing that she had found nothing in the district's records regarding the trustees' concerns and that she had received a glowing supplemental reference from BISD's assistant superintendent.  The board then engaged in another heated discussion regarding Villarreal's candidacy.  Windham and Yaklin expressed "great concern" "for student safety" were the board to rehire him.  Trustee Brandon Greenwood remembered the two women "being concerned about the inappropriate relationships [with students], hanging out with [students] after hours, hearing about text messages between students and teacher, you know, and not necessarily discussing school work," as well as "parties, a student just graduating and then coming out that they were dating . . . now that the student has graduated."  He also recalled multiple trustees discussing Villarreal's relationship with Cuellar and one trustee "saying that

the[y] kn[ew] for a fact that there was a sexual relationship" between Villarreal and Cuellar. Yaklin raised concerns about Villarreal's attendance at student parties where alcohol was present and also participated in the discussion regarding Villarreal and Cuellar's inappropriate relationship.

After this second discussion, the board voted 4-2 to rehire Villarreal. Windham, who cast one of the no votes, later testified that the Facebook post she had shared with Superintendent Perez had "concerned" her and "caused [her] to vote against the hire." Yaklin, who cast the second no vote, cited the concerns raised at the meeting as her reason for doing so. Greenwood testified that at the time of the meeting he "felt confident that these people had reason to be concerned," and testified that his yes vote for Villarreal was "probably the single hardest vote that [he] ever cast." He also shared his belief that Garza, a longtime friend of Villarreal's father, had intimidated Superintendent Perez into recommending that the board rehire Villarreal.

Villarreal resumed teaching at H.M. King in fall 2015. But his return was not without incident. On April 12, 2016, the school reprimanded him for discussing with students who the "prettiest girls" were and directed him to "[r]efrain from inappropriate communication with students." On September 6, 2016, Villarreal received another letter placing him on administrative leave, this time because of "allegations of inappropriate conduct with students" after he attended a private, out-of-school party with students. In investigatory interviews with KISD and H.M. King officials that took place after the party, Villarreal "stated that a parent of a former [H.M. King] student invited [him] to her son's birthday party and that [he] went as a guest." He "denied knowing that any alcohol had been consumed by a minor student at the party." Ultimately, KISD found "no specific evidence of inappropriate conduct" and "assigned [Villarreal] back to [his] position,"

reminding him to use "good professional judgment with regard to [his] relationships" with students.

In fall 2017, Plaintiff-Appellee Matthew Loera enrolled in Villarreal's theatre class at H.M. King. Villarreal asked students for their phone numbers to "coordinate . . . small group meetings" for his class and, a few days later, began texting Loera. The texts were "casual" at first, but within a few weeks, they escalated. Villarreal told Loera that he "wanted to know what all the hype was about" and repeatedly asked for photographs of his genitals. Loera sent Villarreal a photograph, thinking that "[m]aybe it would have made him leave [Loera] alone," but Villarreal's texts became even more insistent and explicit. Loera sent Villarreal five or six additional photographs. In addition to requesting photographs, Villarreal bought Loera food, shoes, watches, sunglasses, and a gold chain. He also kissed Loera on one occasion and, after delivering food to his home one evening, "[ran] his hand down [Loera's] chest towards [his] private parts."

Loera's family discovered the text messages between Villarreal and Loera and called the police. Villarreal was thereafter convicted of online solicitation of a minor and attempted possession of child pornography in connection with his abuse of Loera.

B

In 2021, Loera sued KISD under 42 U.S.C. § 1983 and Title IX, alleging that the KISD board of trustees rehired Villarreal in 2015 despite his history of inappropriate conduct with students. At trial, the jury heard testimony from four KISD trustees who had taken part in Villarreal's rehiring: Yaklin, Windham, Greenwood, and Garza. Superintendent Perez also testified.

On March 21, 2024, in the midst of trial, the district court denied KISD's oral motion for judgment as a matter of law, noting that "these cases

present a high burden for the plaintiffs because of the applicable law here, but there's clearly questions of fact for the jury to proceed on these causes of action." Later that day, the jury unanimously ruled in Loera's favor on both claims and awarded him $250,000 in damages. The district court entered final judgment on April 17, 2024. It thereafter denied KISD's written renewed motion for judgment as a matter of law on July 9, 2024. KISD timely appealed.

## II

We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying "the same legal standard as the district court." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 498 (5th Cir. 2012). "[O]ur standard of review with respect to a jury verdict is especially deferential." *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (quoting *Evans v. Ford Motor Co.*, 484 F.3d 329, 334 (5th Cir. 2007)). We draw all reasonable factual or evidentiary inferences in the light most favorable to the verdict, *Westlake Petrochemicals, LLC v. United Polychem, Inc.*, 688 F.3d 232, 239 (5th Cir. 2012), and the verdict "must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did," *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481–82 (5th Cir. 2008) (first quoting *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008); then citing FED. R. CIV. P. 50(a)(1)). Thus, we will reverse the district court's denial of a post-trial motion for judgment as a matter of law only if "the facts and inferences point so strongly and so overwhelmingly in favor of" the moving party that no reasonable jury could return a verdict against that party. *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001); *see* FED. R. CIV. P. 50(a)(1).

### III

The district court did not err in denying KISD's renewed motion for judgment as a matter of law as to Loera's § 1983 claim.

### A

"Section 1983 creates a private right of action for redressing violations of federal law by those acting under color of state law." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984)). To prevail on a § 1983 claim, "a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008)).

"Municipalities are not liable for the unconstitutional actions of their employees under respondeat superior." *Groden v. City of Dallas*, 826 F.3d 280, 283 (5th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). But a § 1983 plaintiff can establish a claim for municipal liability by showing that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Johnson v. Harris County*, 83 F.4th 941, 946 (5th Cir. 2023) (quoting *Peña v. Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018)); *see Monell*, 436 U.S. at 694. "The 'moving force' inquiry requires a plaintiff to make two showings: causation and culpability." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 280 (5th Cir. 2015) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). For the causation requirement, the plaintiff must show a "direct causal connection . . . between the policy and the alleged constitutional deprivation." *Id.* (alteration in original) (quoting *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992)). For the

culpability requirement, "if the policy is facially lawful, a plaintiff must also show that the municipality 'promulgated [the policy] with deliberate indifference to the "known or obvious consequences" that constitutional violations would result.'" *Id.* (alteration in original) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

## B

KISD challenges the district court's determinations as to both elements of the "moving force" inquiry, contending that there is insufficient evidence to establish that: (1) the requisite causal connection existed between the KISD board of trustees' actions and Loera's injury; and (2) the KISD board of trustees acted with deliberate indifference in rehiring Villarreal. We disagree.

### 1

The causation standard used in the "moving force" inquiry is "higher than 'but for' causation." *Mason*, 806 F.3d at 280 (quoting *Fraire*, 957 F.2d at 1281). The "plaintiff must show that there was 'a strong connection between the background of the particular applicant and the specific violation alleged' such that 'the hired [individual] was highly likely to inflict the particular type of injury suffered.'" *Rivera v. Bonner*, 952 F.3d 560, 565 (5th Cir. 2017) (quoting *Gros v. City of Grand Prairie*, 209 F.3d 431, 434 (5th Cir. 2000)); *see also Valle v. City of Houston*, 613 F.3d 536, 546 (5th Cir. 2010) ("[T]he plaintiff must establish a 'direct causal link' between the municipal policy and the constitutional injury." (quoting *Brown*, 520 U.S. at 404)).

The jury found by a preponderance of the evidence that the board of trustees' decision to rehire Villarreal "was the moving force that caused . . .

Loera to suffer physical sexual abuse by Villarreal." The record supports this finding.

Specifically, there is evidence in the record showing a strong connection between Villarreal's background and his abuse of Loera. *See Gros*, 209 F.3d at 433–34. The record indicates that, when Villarreal was employed at H.M. King the first time, he groomed students with gifts, blurred the lines between teacher and students by attending high school parties at which alcohol was served, demonstrated condom use on a banana in class, and engaged in a very close personal and possibly sexual relationship with a minor student. This is very similar conduct to the conduct for which he was ultimately convicted in connection with his abuse of Loera during his second stint of teaching at H.M. King.

This conclusion comports with our case law concerning "moving force" causation. Where the offending employee previously engaged in the same or similar misconduct alleged as part of the § 1983 claim, we have concluded that "moving force" causation exists. *See, e.g.*, *Parker v. Blackwell*, 23 F.4th 517, 524 (5th Cir. 2022) (concluding in the Fed. R. Civ. P. 12(b)(6) context that "[a]dequate scrutiny of McClure's background—that he was fired by Shelby County for abusing one or more inmates of the Shelby County Jail—would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to rehire him would be that he would abuse inmates again."). But where the employee's prior misconduct was distinctly different from the misconduct alleged in the § 1983 claim, we have sometimes held that the plaintiff failed to show the requisite causation. *See, e.g.*, *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358 (5th Cir. 2020) ("The information about Hernandez reviewed at the time of hiring simply does not show the requisite 'strong connection' between an arrest in 1983 for official oppression and sexual abuse thirty years later."); *Gomez v. Galman*, 18 F.4th 769, 778 (5th Cir. 2021) ("True enough, the fact Galman headbutted

a car's mirror suggests that he is willing to improperly do damage to property. But that is different in kind from the act Galman is accused of here, which is aggressive physical violence toward a citizen.").

This case is more like *Parker*. In *Parker*, the plaintiff alleged that the defendant, a corrections officer, had previously been fired for abusing detainees at the Shelby County Jail, was rehired by the county to work at the same jail, and thereafter abused the plaintiff and others while they were detained there. 23 F.4th at 520–21. Here, similarly, Loera alleges that during Villarreal's first stint as a teacher at H.M. King, he was investigated for engaging in inappropriate, boundary-blurring behavior with students and allegedly had a close personal and potentially sexual relationship with a male minor student. KISD then rehired Villarreal to work at H.M. King, and he thereafter sexually abused Loera, a male minor student, after engaging in grooming and boundary-blurring behaviors. Therefore, like in *Parker*, we conclude that "moving force" causation exists in this case. *Id.* at 524.

Drawing all reasonable inferences in the light most favorable to the jury verdict, as we must, *Westlake Petrochemicals*, 688 F.3d at 239, we conclude that the district court did not err in denying KISD's renewed motion for judgment as a matter of law as to this element of Loera's § 1983 claim.

2

Deliberate indifference "is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown v. Bryan County*, 219 F.3d 450, 457 (5th Cir. 2000) (quoting *Brown*, 520 U.S. at 410). "A showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407.

Here, the jury found by a preponderance of the evidence that the KISD board of trustees acted with deliberate indifference in rehiring

Villarreal: that it was "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] or a violation of constitutional rights exist[ed]" and also "dr[ew] the inference," but nonetheless voted to rehire him. The record supports this finding.

Several trustees testified that, before they voted to rehire Villarreal in 2015, they had notice of allegations that Villarreal had had inappropriate relationships with students in the past. Greenwood, for example, testified that at the July 6, 2015 meeting, Windham and Yaklin expressed "great concern" "for student safety" related to Villarreal's prospective rehiring. He specifically remembered them "being concerned about the inappropriate relationships [with students], hanging out with [students] after hours, hearing about text messages between students and teacher, you know, and not necessarily discussing school work," as well as "parties, a student just graduating and then coming out that they were dating . . . now that the student ha[d] graduated." He also recalled trustees discussing Villarreal's relationship with Cuellar and one trustee "saying that the[y] kn[ew] for a fact that there was a sexual relationship."

Yaklin testified that she raised concerns during the meeting about Villarreal's attendance at student parties where alcohol was present and participated in the discussion regarding Villarreal and Cuellar's inappropriate relationship. She also testified that after Villarreal was hired by BISD in 2012, she learned through mutual friends that Villarreal had had unprofessional interactions with students in that district and thought, "[W]ell, he strikes again." Windham then testified that, during the period of Villarreal's 2015 candidacy, she shared a Facebook post with Superintendent Perez from the year after Cuellar had graduated that involved Villarreal and was "sexual in nature." She further stated that she was "fairly confident [she] brought up the Facebook post" at the July 6, 2015 meeting,

despite the fact that Superintendent Perez had not supplemented Villarreal's application materials with the information.

In addition, these trustees appear to have credited these allegations, such that a reasonable jury could find that they drew the inference that a substantial risk of serious harm could result if Villarreal were rehired. Windham testified that the Facebook post she shared with Superintendent Perez "concerned" her and "caused [her] to vote against the hire." Yaklin also voted no, citing the concerns raised at the meeting. Greenwood, for his part, testified that at the time of the meeting he "felt confident that these people had reason to be concerned" but voted in deference to Garza, who he viewed as a father figure, and testified that his yes vote for Villarreal had been "probably the single hardest vote that [he] ever cast." He also stated that he believed that Garza, a family friend of Villarreal's, intimidated Superintendent Perez into recommending that the board rehire Villarreal.

Despite their awareness of these serious allegations about Villarreal's past inappropriate relationships with students and their personal concerns stemming from these allegations, the board voted 4-2 to rehire him. Based on this evidence, the jury could have reasonably concluded that the board "disregarded a known or obvious consequence of [its] action" when it rehired Villarreal. *Brown*, 219 F.3d at 457. We therefore cannot say that "the evidence points so strongly and so overwhelmingly in favor of" KISD "that no reasonable juror could return a contrary verdict." *Travelers Cas. & Sur.*, 542 F.3d at 482 (internal quotation marks omitted).

## IV

Because there is a "legally sufficient evidentiary basis for a reasonable jury to find as the jury did" as to both elements of Loera's § 1983 claim, *Travelers Cas. & Sur.*, 542 F.3d at 481–82, the district court did not err in

No. 24-40481

denying KISD's renewed motion for judgment as a matter of law as to this claim. Accordingly, we AFFIRM.[2]

---

[2] We need not address the remaining claims and arguments on appeal because the parties agree that affirmance as to one claim is sufficient to uphold the judgment and damages award.