# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 18, 2021

Lyle W. Cayce
Clerk

No. 20-30508

Jorge Gomez,

*Plaintiff—Appellant*,

*versus*

John Galman; Spencer Sutton; City of New Orleans,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:19-CV-11803

Before Stewart, Ho, and Engelhardt, *Circuit Judges*.

Per Curiam:

While sitting at his local bar, Jorge Gomez was harassed and later beaten unconscious by two off-duty New Orleans police officers. Gomez sued, and the district court dismissed Gomez's federal claims because it found that the officers were not acting under color of law. But because Gomez has alleged sufficient facts at this stage to show that his assailants utilized their authority as officers to abuse him, the district court erred on that point. Gomez has not, however, alleged sufficient facts to support all of his claims. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND.

No. 20-30508

I.

On the evening of July 23, 2018, military veteran Jorge Gomez sat at the bar at Mid-City Yacht Club. As was often the case, Gomez was wearing military fatigues. A regular at that bar, Gomez sat by himself and minded his own business. Then, two officers with the New Orleans Police Department ("NOPD"), John Galman and Spencer Sutton, arrived on the scene. The two men were off duty, wore no indicia of being officers, and did not formally announce their positions with NOPD. Unfortunately, their behavior was not becoming of an officer of the law. Galman and Sutton harassed Gomez, calling him a "fake American" and telling him to "go back" to where he came from. At one point the verbal harassment became physical, and the two men attempted to pull off Gomez's clothes. They eventually stole Gomez's beret off his head and left the bar. When Gomez followed the officers outside, Sutton ordered Gomez to stop and not leave the patio of Mid-City Yacht Club. The officers proceeded to beat Gomez until several bystanders intervened to assist the bloodied veteran.

After getting pummeled, Gomez managed to pull himself together and enter his truck to drive to his nearby home. As he was driving away, the officers ordered Gomez to stop and exit his vehicle. Gomez alleges that "[b]ecause they acted like police officers" he "believed he was not free to leave." Accordingly, Gomez followed the officers' order and stepped out of his vehicle. Galman and Sutton again thrashed Gomez. During the attack, Sutton held Gomez down by restraining his hands behind his back and sitting on top of him, which Gomez describes as "a police hold," which the officers "were trained to do." Gomez believed he was being arrested. Eventually, the officers knocked Gomez unconscious. After their victim passed out, Galman and Sutton did not immediately leave the scene. Instead, Sutton called NOPD for backup and identified himself to dispatch as a police officer.

2

No. 20-30508

Gomez was rushed to the emergency room by ambulance, where he was diagnosed with a concussion, a lumbar sprain, and other severe injuries. Gomez continues to suffer some effects from these wounds. NOPD officers twice questioned Gomez while he was convalescing. After a short investigation, Galman and Sutton were charged with simple misdemeanor battery.

Gomez sued Galman, Sutton, and the City of New Orleans. Against the officers, Gomez alleged a violation of his constitutional rights under 42 U.S.C. § 1983, as well as various state law claims including assault, battery, and false arrest. Against the City, Gomez alleged a § 1983 claim for failure to hire, train, supervise, or discipline officers, as well as various state law claims including negligent hiring, negligent supervision and retention, and vicarious liability.

The district court dismissed Gomez's § 1983 claims against the City and the officers. The court found that Gomez had not properly alleged that the officers were acting under of color of law at the time of the attack, and therefore he could not maintain a § 1983 claim against the officers or the City. As an alternative holding, the court found that Gomez had failed to allege an official policy or custom so as to hold the City liable under § 1983. The court further dismissed the negligent hiring, retention, and supervision, *respondeat superior*, and intentional infliction of emotional distress ("IIED") claims against the City. The court declined supplemental jurisdiction over the remaining state law claims. Gomez timely appealed.

## II.

We review a district court's grant of a motion to dismiss de novo. *Masel v. Villarreal*, 924 F.3d 734, 742–43 (5th Cir. 2019). "To survive a motion to dismiss, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (cleaned up). "In conducting this analysis, we accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiffs." *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 263 (5th Cir. 2019) (cleaned up). We do not require "detailed factual allegations," but the complaint must contain sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A complaint's "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557). Additionally, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also Iqbal*, 556 U.S. at 678 (holding that the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").

"In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

No. 20-30508

III.

A.     **"Under Color of Law"**

Under 42 U.S.C. § 1983, one may sue "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State" violates his or her constitutional rights. Based on this language, the Supreme Court has explained that "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). The first question before us is whether Gomez has established that Galman and Sutton were acting "under color of state law" the night that they attacked him.

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 49 (quoting *United States v. Classic*, 313 U.S. 229, 326 (1941)). More simply, "[u]nder 'color' of law means under 'pretense' of law." *Screws v. United States*, 325 U.S. 91, 111 (1945). Generally, if an officer is performing their official duties, their acts "are included whether they hew to the line of their authority or overstep it," though "acts of officers in the ambit of their personal pursuits are plainly excluded." *Id.* That said, even if an officer acts for purely personal reasons, he or she may still act under color of law if they are "acting by virtue of state authority." *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991).

Importantly here, it is "clear that whether a police officer is acting under color of law does not depend on duty status at the time of the alleged violation." *Id.* Rather, to determine whether an officer acted under color of law, we must consider: (1) "whether the officer misused or abused his official

5

power" and (2) "if there is a nexus between the victim, the improper conduct, and the officer's performance of official duties." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 464–65 (cleaned up).

Viewing his complaint in the light most favorable to Gomez—as we must—we determine that he has adequately pleaded facts which establish that Galman and Sutton acted under the color of law. First, Gomez alleges that when he exited the bar, Sutton "acting as a police officer, gave Mr. Gomez a direct order to stop and not leave the patio area of the bar." Gomez obeyed this order. Then, when he attempted to drive away after getting violently beaten, Sutton and Galman "ordered him to stop" and "ordered [him] to step out of his vehicle." Gomez claims that "[b]ecause they acted like police officers, [he] believed he was not free to leave, and did as he was ordered."

These allegations are key. A victim usually does not follow orders from someone who just attacked him without good reason to do so. He is even less likely do so when—as alleged here—the victim was in the process of escaping his attackers. The fact that Gomez stopped and exited his vehicle at his attackers' commands lends significant credence to his allegation that he believed them to be police officers, because the complaint offers no reason for Gomez to obey Galman and Sutton unless they were "acting by virtue of state authority." *Tarpley*, 945 F.2d at 809.

Gomez alleges other facts indicating that Galman and Sutton "misused or abused their official power." *Bustos*, 599 F.3d at 465. For example, Gomez asserts that the officers "forced him onto his stomach, and placed his hands behind his back in a police hold as they were trained to do during an arrest, and effected an arrest of Mr. Gomez." This caused Gomez to "believe[] he was being arrested." The use of the police hold further indicates that Galman and Sutton were abusing their official power and

exercising their authority as officers in their efforts to harm Gomez. Further, Sutton "called for backup in continuing to make an arrest" and Defendants "identified themselves to NOPD dispatch as NOPD officers." Gomez concedes that by the time the officers called for backup he was unconscious. Nevertheless, Defendants' call for backup—and especially their identification of themselves as officers of the law—adds to the "air of official authority" that pervaded the assault. *Tarpley*, 945 F.2d at 809. Taken together, these allegations are sufficient to plead that the officers misused their official power. Accordingly, the district court erred in finding that Galman and Sutton did not act under color of law.

*Bustos v. Martini Club, Inc.* is not to the contrary. In that case, a plaintiff got into a bar fight with various officers in San Antonio. *Bustos*, 599 F.3d at 460–61. Because the officers were blocking the back door, the plaintiff headed for the alley, where the officers were "holding each other's shoulders as a group of SWAT officers showing force" and one officer pushed the plaintiff to the floor. *Id.* at 461. Bustos also alleged that he called 911, but the operator would not help him because he could not identify the officers' badge numbers, though he did not allege that the officers were in uniform. *Id.* at 461, 465. The district court found that Bustos failed to plead that the officers acted under color of law, and this Circuit affirmed. In doing so, we noted that "Bustos does not allege facts to suggest that the officers who assaulted him misused or abused their official power," and that "no 'air of authority' pervaded [that] barroom altercation." *Id.* at 465.

Here, Gomez has alleged facts that demonstrate an "air of authority" not present in *Bustos*. Unlike Gomez, Bustos did not allege that the off-duty officers gave him orders. And Bustos certainly did not allege that he would have felt obligated to comply because the defendants were officers of the law. Although Bustos claimed that the officers who hurt him held each other's shoulders like a SWAT team, that act is different in kind from a "police

hold" that is routinely used during arrests. Indeed, Bustos never claimed that he felt that he was under arrest. Taken together, the allegations Gomez levies demonstrate a far greater "air of authority" than that present in *Bustos*.

Our holding does not disturb well-established case law that "acts of officers in the ambit of their personal pursuits are plainly" not under color of law. *Screws*, 325 U.S. at 111. We merely hold that, viewed in the light most favorable to Gomez, he has pleaded sufficient facts at this early stage of litigation to suggest that Galman and Sutton were "acting by virtue of state authority." *Tarpley*, 945 F.2d at 809. His allegations are sufficient to allow this matter to proceed to discovery, where additional fact-finding may support—or vitiate—Gomez's claims.

## B.    Gomez's *Monell* Claim

Because we have determined that Galman and Sutton acted under color of law, we must determine whether Gomez has adequately pleaded a claim against the City of New Orleans. In *Monell v. Department of Social Services*, the Supreme Court held that municipalities may be sued under § 1983 but cannot be held liable for acts of their employees under a theory of *respondeat superior*. 436 U.S. 658 (1978). Rather, to state a claim against a municipality under *Monell* and its progeny, Gomez must plead that "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Davidson v. City of Stafford, Tex.*, 848 F.3d 384, 395 (5th Cir. 2017). Because Gomez fails to adequately plead an official policy, we need not address the second or third elements.

Official municipal policies can take various forms. They often appear as written policies, but an official policy may also be an unwritten but "widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Alvarez v. City of*

8

*Brownsville,* 904 F.3d 382, 390 (5th Cir. 2018) (quoting *James v. Harris County*, 577 F.3d 612, 617 (5th Cir. 2009)).  Gomez presses three theories of official policies that he alleges caused his harm.  First, he asserts that the City has an official policy or custom of hiring unqualified police officers.  Second, he argues the City has a policy of failing to train its officers in the basic elements of effective policing.  Finally, Gomez contends that the City has an official policy of protecting its police officers from the consequences of their wrongdoing, or a "Blue Code of Silence."  We address each of these purported policies in turn.

We first address Gomez's claim that the City had a policy of hiring and retaining unqualified officers.  The City may be held liable for decisions about hiring and retention if Gomez can demonstrate "deliberate indifference" to the "known or obvious consequence[s]" of such decisions. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).  Indeed, "[a] showing of simple or even heightened negligence will not suffice."  *Id.* at 407.  Deliberate indifference exists "where adequate scrutiny of an applicant's background would lead a reasonable supervisor to conclude that the plainly obvious consequences of the decision to hire would be the deprivation of a third party's constitutional rights."  *Gros v. City of Grand Prairie*, 209 F.3d 431, 433–34 (5th Cir. 2000) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998)).  To show deliberate indifference, the connection between the background of the individual and the specific violation alleged must be strong, as the plaintiff "must show that the hired officer was highly likely to inflict the particular type of injury [he] suffered." *Id.* at 434; *see also Brown*, 520 U.S. at 412.

Gomez fails to allege any facts that would demonstrate deliberate indifference in the hiring or retention of Sutton.  Gomez does, however, allege two instances of prior misconduct by Galman, which he contends put the City on notice that Galman would engage in conduct violative of citizens'

constitutional rights.  First, Gomez pleads that in May 2018, Galman performed an illegal, invasive, and public strip search on an arrestee in his custody.  Second, Gomez alleges that in June 2018, Galman hit the passenger side window of a car while walking by it, and when confronted, he headbutted the side mirror so hard it knocked the mirror glass loose.  The City determined this act violated at least four of its rules.

Galman's conduct in these instances was egregious.  But it does not provide support for Gomez's claim because these incidents are too unlike Galman's conduct here to establish "deliberate indifference" on the City's part.  The Supreme Court has emphasized that "[t]he connection between the background of the particular [defendant] and the *specific* constitutional violation alleged must be strong." *Brown*, 520 U.S. at 412 (emphasis added).  Galman's improper strip-search of an arrestee does not make "plainly obvious" that Galman had a proclivity toward such brutal violence as alleged here.  True enough, the fact Galman headbutted a car's mirror suggests that he is willing to improperly do damage to property.  But that is different in kind from the act Galman is accused of here, which is aggressive physical violence toward a citizen.  These incidents simply do not "show that [Galman] was highly likely to inflict the particular type of injury [Gomez] suffered." *Gros*, 209 F.3d at 434.

Gomez also relies on the NOPD's "historically tainted record" of recruitment and hiring to argue that the City's flawed practices in those areas constituted a policy.  Gomez's complaint cites to the findings of a 2011 Department of Justice ("DOJ") Investigation into the NOPD, which concluded that deficiencies in recruitment and retention of officers contributed to a pattern of police misconduct.   As a result of the investigation, in 2012 the City and the DOJ entered into a Consent Decree which required the City to implement new polices in various areas, including recruitment and retention.  Gomez further alleges that, in 2018, the

No. 20-30508

Independent Monitor who oversaw enforcement of the Consent Decree filed an annual report noting that NOPD continued to deal with deficiencies in officer recruitment.[1]

With respect to the 2011 DOJ report, we do not see how NOPD's problems with hiring and retention almost a decade ago translate to a policy of deliberate indifference in hiring and retention in 2018, when this incident occurred. To the contrary, the fact that the City entered into a Consent Decree suggests that the City recognized that a problem existed and agreed to remedy it. That is hardly consistent with demonstrating "deliberate indifference" on the City's part. Of course, for other claims and in other contexts, the DOJ report and Consent Degree may be useful evidence; but on these facts, they are not.

The report of the Independent Monitor is closer in time to the officers' assault. But it, too, fails as sufficient evidence of deliberate indifference. Although the report gestures broadly to issues NOPD has with hiring and retention, it does not discuss specific conduct of officers like what is alleged here. It therefore fails to "show that [Galman] was highly likely to inflict the *particular type* of injury [Gomez] suffered." *Gros*, 209 F.3d at 434 (emphasis added). Further, the report makes clear that the City was actively working to remedy any existing issues in hiring and retention by implementing the report's recommended action items. As the district court noted, "Gomez has simply not alleged the requisite link between instances of problematic conduct identified in the consent decree or reports and the

---

[1] We note that while Gomez alleges that the Independent Monitor filed his 2017 report on April 10, 2018, the report attached to the Complaint is dated January 18, 2017 and gives no indication it was released in 2018. But whether the report was issued in 2017 or 2018 does not make a material difference here, as the report does not support Gomez's claims.

incident at issue." We agree. And because none of the evidence that Gomez pleads adequately supports his hiring and retention claim, that claim fails.

Next, we address Gomez's argument that the City had a policy of failing to train its officers. In order to successfully plead a claim for failure to train, a plaintiff "must plead facts plausibly establishing '(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question.'" *Ratliff v. Aransas Cnty.*, 948 F.3d 281, 285 (5th Cir. 2020) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010)). In the failure-to-train context, deliberate indifference may be established in two ways. First, a plaintiff may plead that a municipality had "notice of a pattern of similar violations at the time the plaintiff's own rights were violated." *Robles v. Ciarletta*, 797 F. App'x 821, 833 (5th Cir. 2019). Second, failure to train may amount to deliberate indifference when the specific injury suffered is a "highly predictable consequence of a failure to train." *Id.* at 833–34.

Gomez's complaint fails under either approach. Gomez does not allege a single specific instance like the facts here. Instead, he relies solely on the DOJ investigation and the Independent Monitor's report. But as described above, those reports only broadly illustrate officer misconduct without any discussion of "a pattern of similar violations at the time [Gomez's] own rights were violated." *Id.* at 833. Nor does Gomez allege any facts by which the court could find that he suffered harm "as the highly predictable consequence of a failure to train." *Id.* at 833–34. As described above, Gomez does plead facts regarding two instances of misconduct by Galman, but neither of those instances are similar enough to the conduct here to demonstrate that the attack on Gomez was a "highly predictable" consequence of a failure to train.

No. 20-30508

Finally, we address Gomez's claim that NOPD had a "Blue Code of Silence," or official policy of protecting its police officers from the consequences of their wrongdoing. This claim is easily disposed of. Gomez alleges no facts showing a "widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy." *Alvarez,* 904 F.3d at 390. Most of Gomez's allegations about this policy are conclusory; and even the paltry facts Gomez alleges to support his claim, such as that Galman and Sutton expected not to face consequences for their actions, are contradicted by other allegations, including the swift punishment the officers received.[2] Further, the non-conclusory allegations speak only to this incident, and a "customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001). This claim fails.

Although Gomez musters enough facts to demonstrate the officers were acting under color of law, he does not allege sufficient facts to support a *Monell* claim against the City based on the officers' actions. Accordingly, we affirm the district court's dismissal of Gomez's § 1983 claim against the City.

## C.    Gomez's State Law Claims

Finally, we turn to the state law claims against the City that the district court addressed. These include (1) negligent hiring, retention, and supervision, (2) vicarious liability, and (3) intentional infliction of emotional distress. We address each in turn.

---

[2] Gomez alleges that both officers were arrested and charged with battery. The City also represents in its briefing that it terminated Galman and Sutton the day after the assault.

No. 20-30508

We start with Gomez's claims for negligent hiring and negligent retention and supervision against the City of New Orleans. "A claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, retaining, or supervising the employee generally is governed by the same duty-risk analysis" used in Louisiana for negligence claims. *Kelley v. Dyson*, 10 So. 3d 283, 287 (La. App. 5 Cir. 2009). The elements of liability in a Louisiana negligence case are: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages. *Id.* Because the existence of a duty is the only question of law, we turn our focus to the first factor. *Griffin v. Kmart Corp.*, 776 So. 2d 1226, 1231 (La. 2000).

The district court dismissed the negligent hiring and negligent retention and supervision claims against the City largely for the same reasons it dismissed Gomez's *Monell* claim. But Louisiana's test for whether a duty exists for these claims is different than the test for whether Gomez states a *Monell* claim. Specifically, Louisiana law tells us that "[w]hen an employer hires an employee who in the performance of his duties will have a unique opportunity to commit a tort against a third party, he has a duty to exercise reasonable care in the selection of that employee." *Kelley*, 10 So. 3d at 287. The primary focus is whether the "the employment gave the tortious/criminal employees 'unique opportunities' to commit their wrongdoing." *Id.* at 287–88. Of course, this is a world apart from requiring Gomez to show an official policy of hiring and retaining unqualified officers. *Davidson*, 848 F.3d at 395.

Gomez has pleaded sufficient facts to show that Sutton and Galman did benefit from the "unique opportunities" provided by their employment during their assault on Gomez. Gomez alleges that he only exited his vehicle because he was given an order by the officers and felt he was not free to leave. Gomez further alleges that the officers placed him "in a police hold as they

were trained to do during an arrest." The use of a cloak of authority to stop a victim and the use of a police hold that they had been specifically trained to perform constitute "unique opportunities" provided by their employment. Given this, these claims cannot be dismissed on the grounds that the City owed Gomez no duty. And because the other four elements are factual questions, *Griffin*, 776 So. 2d at 1231, we cannot decide them at this early stage.

A state-law claim for vicarious liability has yet a different test. An employer may be held vicariously liable for the tortious acts of its employees only when they are performed "in the exercise of the functions in which they are employed." La. Civ. Code art. 2320. Vicarious liability attaches only "if the employee is acting within the ambit of his assigned duties and also in furtherance of his employer's objective." *Baumeister v. Plunkett*, 673 So. 2d 994, 996 (La. 1996) (quotations omitted). In other words, "an employee's conduct is within the course and scope of his employment if the conduct is . . . activated at least in part by a purpose to serve the employer." *Patrick v. Poisso*, 882 So. 2d 686, 691 (La. App. 2 Cir. 2004).

The test for vicarious liability is harder for a plaintiff to meet than the tests for other state law claims discussed above. The plaintiff must demonstrate not only that the tortfeasors were enabled by "unique opportunities" of their employment to commit their wrongdoing, but also that the employee's conduct is "within the course and scope of his employment." *Id.* Indeed, this is an even greater burden than demonstrating that an officer's actions are "under color of law," which does not depend on duty-status or whether the action was for the benefit of the state. *See Tarpley*, 945 F.2d at 809. Gomez pleads no facts that could demonstrate that the officers' conduct was "in furtherance of his employer's objective." *Baumeister*, 674 So. 2d at 996. To the contrary, while Galman and Sutton may have been able to inflict such harm on Gomez because of their positions

of authority, NOPD immediately rebuked their actions. The district court correctly dismissed the vicarious liability claim against the City.

Finally, we turn to Gomez's intentional infliction of emotional distress claim. To establish an IIED claim in Louisiana, a plaintiff must show: "(1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct." *White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991). A careful review of Gomez's amended complaint reveals no facts that would support the first or third elements of this claim against the City. Although Gomez may have alleged an IIED claim against Galman and Sutton, their conduct is only attributable to the City through *respondeat superior*, a claim we have already explained fails. Therefore, the district court correctly dismissed the IIED claim against the City.

## IV.

For the foregoing reasons, we AFFIRM the grant of the City's Motion to dismiss as to Gomez's *Monell* claim, vicarious liability claim, and IIED claim. We REVERSE the dismissal of the § 1983 claims against Galman and Sutton and the dismissal of Gomez's state-law negligent hiring, retention, and supervision claim against the City. We REMAND this matter to the district court for further proceedings consistent with this opinion.

JAMES C. HO, *Circuit Judge*, concurring:

As a strictly doctrinal matter, this is a close case. Gomez alleges that he believed his assailants were police officers, and that for that reason, he complied with their orders, rather than flee to avoid further injury. But he never explains *why* he believed the defendants were police officers. He does not allege that they wore uniforms, displayed their badges, or otherwise presented themselves to him as police officers. And it is not Gomez's subjective beliefs, but the officers' conduct, that determines whether the defendants acted "under color of [state law]" as required under 42 U.S.C. § 1983. *See, e.g., Bustos v. Martini Club Inc.,* 599 F.3d 458, 464–65 (5th Cir. 2010) ("Whether an officer is acting under color of state law" turns on "(1) whether the officer misused or abused his official power, and (2) if there is a nexus between the victim, the improper conduct, and the officer's performance of official duties.") (cleaned up). So I can see how the district court might have concluded that this case cannot proceed under § 1983.

That said, I am not prepared to dismiss all of Gomez's claims at this time. Some circuits have recognized that a plaintiff's subjective beliefs may bear "some relevance" to the color of law determination. *See, e.g., Barreto-Rivera v. Medina-Vargas,* 168 F.3d 42, 47 (1st Cir. 1999) ("Although we [have] accorded the subjective reactions of the victim some relevance in the color of law analysis . . . , the primary focus of the color of law analysis must be on the conduct of the police officer."); *Strange v. Porath,* 104 F.3d 368 (10th Cir. 1996) (noting that, although a victim's "subjective perception . . . may be a relevant factor in determining whether [an officer] acted under color of law, it is not determinative").

In addition, there is at least some support in our circuit precedent for the proposition that the officers here acted under color of state law because they later called for police backup. *See, e.g., United States v. Tarpley,* 945 F.2d

806, 809 (5th Cir. 1991) ("Significantly, [the defendant] summoned another police officer from the sheriff's station and identified him as a fellow officer and ally."). *See also Halmu v. Beck*, 2021 WL 980912, *4 (S.D. Fla. Mar. 15, 2021) (officers acted under color of law where they "filed a false arrest affidavit and omitted significant facts to conceal police wrongdoing under color of state law in order to avoid liability").

In light of these authorities, I am happy to reverse in part and remand for further proceedings, and therefore concur.

Moreover, although reasonable minds can debate whether the misconduct alleged here is actionable under § 1983, it is unquestionably contemptible.

Accepting the allegations in the complaint as true, as we must at this stage, Jorge Gomez is a U.S. citizen and decorated military veteran of Honduran descent. On the night in question, he visited a local bar, proudly wearing his military regalia. Officers Galman and Sutton ordered Gomez to approach. They called him a "fake American" and a "liar" and told him to "go back" to wherever he came from. They attempted to strip off his military clothing. And then they brutally beat him until two bystanders intervened to stop the attack. They left Gomez sprawled across a patio table, bruised and bloodied. After he managed to get up, Gomez entered his car and began driving away. But the officers ordered him to stop and exit his vehicle. Believing he had no choice, Gomez complied. The officers then knocked Gomez to the ground, forced him onto his stomach, held his arms behind his back, and beat him unconscious.

"Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards." *United States v. Taffaro*, 919 F.3d 947, 949 (5th Cir. 2019) (Ho, J., concurring in the judgment). If the allegations in this case are true, the

No. 20-30508

officers have not merely brutalized one man—they have badly undermined public trust in law enforcement. And unfortunately, the misconduct alleged here is not unique. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 402–06 (5th Cir. 2015) (black high-school students brought Section 1983 claims against public officials after years of racially-motivated harassment, including racial slurs and nooses placed on their cars); *United States v. Harris*, 293 F.3d 863, 870, 882 (5th Cir. 2002) (defendant police chief repeatedly beat Mexican-American in the head with a baton and told FBI agents that "Mexicans do not have the same rights as 'real Americans'"); *Patel v. Dennett*, 389 F. Supp. 3d 888, 892–93 (D. Nev. 2018) (defendant police officer told Indian-American to "go back where you came from" before breaking his arm during illegal arrest); *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 80 (D. Conn. 2016) (defendant police officers used racial epithets while conducting an illegal, public strip-search without gloves); *Polite v. Town of Clarkstown*, 120 F. Supp. 2d 381, 383 (S.D.N.Y. 2000) (defendant police officers shouted racial epithets at plaintiff arrestees, put guns to their heads, and threatened to pull the trigger); *Hardeway v. City of Chicago*, 1991 WL 203857, *1–2 (N.D. Ill. Oct. 4, 1991) (defendant police officers beat plaintiff while using profanities and racial slurs).

I agree that the district court should not have dismissed Gomez's claims against the officers at this early stage in the proceedings. Accordingly, I concur.