# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 28, 2022

Lyle W. Cayce
Clerk

No. 21-40590

Melissa Tyson,

*Plaintiff—Appellant*,

*versus*

County of Sabine; David W. Boyd, *Individually and in his official capacity as Constable*; Thomas N. Maddox,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 9:19-CV-140

Before Clement, Graves, and Costa, *Circuit Judges*.
Edith Brown Clement, *Circuit Judge*:

This appeal arises from an alleged sexual assault committed by a law enforcement officer while he was conducting a welfare check on the plaintiff at her home. The district court found that the officer was entitled to qualified immunity. We AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

No. 21-40590

**I**

On September 18, 2018, Wade Tyson called the Sheriff's Department of Sabine County, Texas, to request a welfare check on his wife, Melissa Tyson ("Tyson"). Wade reported that he was out of town and worried about his wife, who was home alone and distressed. Defendant Deputy David Boyd called Tyson that evening and told her that he would visit the next morning to conduct a welfare check. He introduced himself as a sheriff. He told her that he handled welfare checks because he was a preacher.[1] During the call, Tyson overheard Deputy Boyd tell other officers not to respond to Wade's request for a welfare check on Tyson because he was addressing it.

The next morning, Deputy Boyd showed up alone at Tyson's home in a plain car and wearing a shirt identifying himself as a "Sheriff." He was not visibly carrying a weapon. Tyson offered a handshake but, instead, Deputy Boyd hugged her. Deputy Boyd asked if there was a place that they could talk. She led him to chairs and a table on the side porch of the house. Before sitting down, Deputy Boyd asked if she had security cameras or neighbors, and he began to search the exterior of the home. Tyson said that she did not have cameras and her neighbors were usually not home. He commented that Tyson "must be lonely with [her] husband being gone" and "living . . . by [herself] the majority of the time at a dead-end road." Tyson said that she wasn't lonely, she was fine. She testified that she thought the officer's behavior was strange, but she gave him the benefit of the doubt because he was helping her.

---

[1] Deputy Boyd's ministerial credentials had actually been revoked eleven years prior because of prohibited sexual conduct. During his time as a minister, he was also sued by church members for alleged sexual misconduct.

No. 21-40590

Deputy Boyd stayed for approximately two hours, during which time he made numerous inappropriate sexual statements and commands, which the district court found were neither invited nor consensual.[2]  For example, Deputy Boyd told Tyson that he and fellow officers had recently seen her at a restaurant, and he repeated sexual comments that the officers made about her body.  For example, he said that the officers talked about "what they would like to do to [her] if they could."  He also compared the size of Tyson's breasts with his wife's breasts.  He pressed her to answer invasive questions about her sex life, such as whether she and her husband would consider a threesome and whether her husband would allow someone to watch them having sex.  And he asked for nude pictures of her husband.

At some point, Deputy Boyd received a phone call from his wife, and he answered it on speakerphone without notifying his wife.  He told his wife that he was "running errands."  He then solicited nude photos from his wife and made sexually explicit comments.

Tyson was troubled by Deputy Boyd's statement to his wife that he was not on duty, so she sought to "get some distance" from him by retreating into her home for water.  Without invitation, he followed her.  Tyson gave him the water and led him back outside.

Tyson contends that she felt forced to submit to Deputy Boyd's sexual misconduct because she was isolated and alone, as Deputy Boyd had pointed

---

[2] In the proceedings below, the district court explicitly rejected defendants' "gross mischaracterization of this incident as" consensual.  On appeal, defendants do not challenge the district court's finding that Tyson neither "consented to, [n]or invited, Deputy Boyd's [alleged] sexual assault."  And the record does not support that the district court's finding was clear error. *See* FED. R. CIV. P. 52(a).  It is obvious that "'[c]onsent' that is the product of official intimidation or harassment is not consent at all.  Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse." *Florida v. Bostick*, 501 U.S. 429, 438 (1991).

out; she felt intimidated by his authority; and she was frightened that the sexual harassment would escalate if she did not comply.

Tyson also testified that she felt coerced to submit to the sexual misconduct because Deputy Boyd implicitly threatened to ticket her for possession of drug paraphernalia. That morning, Tyson had left marijuana paraphernalia on a table in her home, which was visible through a window from the side porch. During their conversation, Deputy Boyd described issuing tickets for marijuana possession to attendees of a swinger's club. He stated that he would sometimes "just take their stuff and then send them on the way to the party," but that, "most of the time," it was his "duty to issue a ticket." At the time he made the comment, he was facing the window looking into the home, and Tyson contends that from his vantage point he could see the marijuana paraphernalia. Based on the "frequency of it coming up," Tyson perceived that Deputy Boyd's story about ticketing attendees of the swinger party was a veiled threat to coerce her into going along with the sexual misconduct.

Tyson alleges that Deputy Boyd then sexually assaulted her on the porch of her home. He commanded her to expose her breasts and her vagina, and spread her labia to expose her clitoris. After a prolonged hesitation, Tyson complied. Deputy Boyd then masturbated to ejaculation in front of her. She closed her eyes and waited for him to finish, at which point he left.

Immediately afterwards, Tyson felt distressed and cried. Deputy Boyd texted her multiple times following the incident—messages such as "I saw you today" or "I haven't heard from you"—but she did not respond. She messaged a friend that she was "worr[ied] about him hurting [her]." She began frequently seeing a psychotherapist and a hypnotherapist, her intimacy with her husband significantly decreased, she gained thirty pounds, she started carrying a gun, she put cameras up, and she generally stopped leaving

her home.  In short, the incident "changed [her] whole life," and she isn't "who [she] used to be."  She reported the incident to the Texas Rangers because she was not sure who she could trust in local law enforcement based on Deputy Boyd's story that he and other officers had been talking sexually about her body.  This was not the first allegation of sexual misconduct against Deputy Boyd; at least three other complaints had been made by other people.

In April 2019, Deputy Boyd was indicted by the State of Texas and charged with sexual assault, indecent exposure, and official oppression.  *See* Tex. Pen. Code §§ 22.011, 21.08, 39.03.[3]  In the same month, Tyson sued the County of Sabine, the County Sheriff, and Deputy Boyd, individually and in his official capacity as constable, asserting claims under 42 U.S.C. § 1983 for alleged violations of her rights under the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.  After a series of stays for the pending criminal proceedings, defendants moved for summary judgment, arguing that there were no underlying constitutional violations.

The district court agreed.  *See Tyson v. County of Sabine*, No. 9:19-CV-140, 2021 WL 3519294, at *7 (E.D. Tex. July 14, 2021).  The court found that the Fourth Amendment claim of excessive force failed because Tyson had not been seized, and that the Eighth Amendment claim failed because she was not a prisoner.  *Id.* at *3–5.  As for the Fourteenth Amendment claim, the district court found that Tyson satisfied the injury requirement under § 1983.  *Id.* at *5.  The court also emphasized that Tyson had "not . . . consented to, or invited, Deputy Boyd's sexual assault" and that "Deputy Boyd . . . abuse[d] his authority when he sexually assaulted Tyson."  *Id.* at *4–5.  Nevertheless, the district court concluded that Tyson's right to bodily integrity had not been violated because Deputy Boyd had not physically

---

[3] These criminal proceedings are ongoing.

touched her, and thus the alleged conduct did not shock the conscience. *Id.* at *7.

The court dismissed the remaining claims—a *Monell* claim against the County and a claim of inadequate hiring, training, and supervision against the County and Sheriff—for lack of an underlying constitutional violation.

Tyson timely appealed the dismissal of her claims under the Fourth Amendment and Fourteenth Amendment, as well as her claims against the County and Sheriff.

## II

We review the district court's grant of summary judgment *de novo*. *See Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view the evidence in the light most favorable to the non-movant, "drawing all justifiable inferences in [her] favor." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 609 (5th Cir. 2018).

Deputy Boyd has invoked the defense of qualified immunity. That doctrine "balance[s] two competing societal interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 328 (5th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The defense only immunizes public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

No. 21-40590

At summary judgment, an officer's good-faith assertion of qualified immunity shifts the burden of proof to the plaintiff to show that the defense is unavailable. The plaintiff must present evidence "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

## III

Although we have discretion to begin with either prong of qualified immunity, *see Callahan*, 555 U.S. at 237, we think it beneficial to first consider whether the facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Tyson alleges a violation of her rights under the Fourth Amendment and Fourteenth Amendment.

"*[A]ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 395 (1989). However, "[t]he Fourth Amendment covers only 'searches and seizures.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Thus, where neither a search nor a seizure took place, the claim falls outside the Fourth Amendment and comes instead within the substantive due process component of the Fourteenth Amendment. *Id.* at 843–44 (analyzing excessive-force claim arising from fatal car crash under the Fourteenth Amendment because there had been no seizure); *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997).

Neither party suggests that there was a search here, thus we consider only whether the alleged sexual abuse occurred during a seizure.

## A

"A voluntary encounter between an officer and a citizen may ripen into a seizure[] triggering the Fourth Amendment . . . 'only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen.'" *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). Where, as here, the alleged detainee had "'no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Bostick*, 501 U.S. at 435–36).

While no per se rules govern when an encounter with law enforcement constitutes a seizure, *see Florida v. Royer*, 460 U.S. 491, 506 (1983), circumstances indicative of a seizure include: "the threatening presence of several officers"; "the display of a weapon by an officer"; "physical touching of the person of the citizen"; and "the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *Mask*, 330 F.3d at 337 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). We have also given weight to an officer "blocking an individual's path"; "implicit constraints on an individual's freedom as would be caused by retaining an individual's" possessions, and "statements by officers that individuals are suspected of smuggling drugs." *United States v. Berry*, 670 F.2d 583, 597 (5th Cir. Unit B 1982).

Tyson argues that the consensual welfare check transformed into a seizure because Deputy Boyd's story about ticketing swingers for marijuana possession indicated that he was investigating her for marijuana possession and thus, that she was not free to leave. She testified that she believed he could see her marijuana paraphernalia left out on the table through the

window from where he was sitting; that he mentioned marijuana frequently and without reason; and that he emphasized his "duty to issue a ticket." She argues that he had no reason to bring up marijuana other than because he had seen her paraphernalia inside the house.

We have recognized that statements by an officer indicating that an individual is suspected of illegal activity are persuasive evidence that an objectively reasonable person would not feel free to leave. *See Berry*, 670 F.2d at 597 ("Statements which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would lead only to formal detention."); *see also United States v. Gonzales*, 79 F.3d 413, 420 (5th Cir. 1996) (noting officers' statement "that the car [the defendant] was driving was suspected of being used to transport drugs . . . . may have pushed the encounter, which was initially consensual, to being a *Terry* stop"); *United States v. Zukas*, 843 F.2d 179, 182 (5th Cir. 1988) ("[W]hen the police officers . . . informed [the defendant] . . . that he was suspected of smuggling drugs," a seizure occurred); *United States v. Galberth*, 846 F.2d 983, 990 n.11 (5th Cir. 1988) (noting officer's instruction that defendant be "pat [ ] down for 'possible narcotics'" effected a seizure); *United States v. Hanson*, 801 F.2d 757, 761 (5th Cir. 1986) ("[W]hen [the officer] . . . informed [the defendant] that he . . . [was] suspected of carrying drugs, a reasonable person would not have believed that he was free to go."). In each of these cases the officers explicitly stated a particularized suspicion of drug possession by the individual.

By contrast, we have rejected that a person was seized simply because they *assumed* that a police officer suspected them of criminal activity. In *United States v. Mask*, the defendant argued that he was seized when he overheard the officers talking about his license report information and inferred that the officers suspected him of criminal activity. 330 F.3d at 339. We reasoned that, although the defendant "may have surmised . . . that the

officers had come to suspect him of illegal activity[,] [ ] this alone gives us insufficient reason to conclude that [he] was no longer free to leave." *Id.*

Similarly, Tyson's assumption that Deputy Boyd suspected her of marijuana possession based on a story about *other* people caught possessing marijuana is insufficient to effect a seizure. Deputy Boyd did not accuse Tyson of drug possession nor explicitly indicate awareness of her drug paraphernalia. And although he described a duty to ticket for possession, he also said he would sometimes just confiscate the drugs and let the owner keep going. Deputy Boyd's story about ticketing attendees of a swinger party for possession of marijuana would not have indicated to an objectively reasonable, innocent person that they were suspected of wrongdoing.

Tyson also argues that she was seized because Deputy Boyd made intimidating sexual advances while she was home alone. But she does not argue that he ever told her she could not leave or otherwise attempted to physically prevent her from terminating the encounter. An intimidating police presence does not, standing alone, constitute a seizure. *See Michigan v. Chesternut*, 486 U.S. 567, 575 (5th Cir. 1988).

As a matter of law, the record does not support that Tyson was seized. The district court did not err to dismiss her Fourth Amendment claim.

**B**

Having determined that Tyson was not seized, we turn to her claim that the alleged sexual abuse violated her Fourteenth Amendment rights.

**1**

The substantive component of the Due Process Clause under the Fourteenth Amendment secures the "right to be free of state-occasioned damage to a person's bodily integrity." *Doe v. Taylor Indep. Sch. Dist.* ("*Taylor ISD*"), 15 F.3d 443, 450–51 (5th Cir. 1994) (en banc) (quoting

No. 21-40590

*Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981)).[4] A violation of the right to bodily integrity follows from "behavior of the governmental officer [that] is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8.

We have long recognized that physical sexual abuse by a state official violates the right to bodily integrity. *See United States v. Guidry*, 456 F.3d 493, 506 n.7 (5th Cir. 2007) (affirming the Fourteenth Amendment protects "the right to be free from sexual assault" committed by a law enforcement officer against a non-detainee); *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1406 (5th Cir. 1995) (recognizing the established "liberty interest in freedom from sexual abuse by persons wielding state authority"); *Taylor ISD*, 15 F.3d at 450–51 (holding that "physical sexual abuse" by a government actor violates a child's right to bodily integrity).

That is because the core of the right to substantive due process protects against the state's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 846; *see also Collins v. Harker Heights*, 503 U.S. 115, 126 (1992) ("[T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government [officials] 'from abusing [their] power, or employing it as an instrument of oppression.'" (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 196 (1989))). Because the state has no

---

[4] In its recent holding that the Constitution does not confer the right to abortion, the Supreme Court made clear that "[n]othing in [its] opinion should be understood to cast doubt on precedents that do not concern abortion." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2277–78 (2022).

11

interest in sexually abusing its citizens, sexual abuse by a state official cannot be justified by any legitimate governmental objective.

Here, Deputy Boyd allegedly visited Tyson alone at her home under the pretense of a welfare check and coerced her to strip for his sexual gratification.  He further ordered her to show him her clitoris while he masturbated to her exposed body.  It is beyond dispute that no legitimate state interest can justify an officer's use of coercion to compel the subject of a welfare check to expose her most private body parts for his sexual enjoyment.  Nor does Deputy Boyd argue that any legitimate state interest could justify his instructions to Tyson to perform nonconsensual sexual acts while he masturbated.

Moreover, this is not a case of recklessness, negligence, or overzealous policing.  *See Lewis*, 523 U.S. at 849.  The record supports a premeditated intent to introduce sexual abuse into the welfare check because Deputy Boyd misrepresented to Tyson that he was on duty and searched the exterior of the home for cameras immediately upon arrival.  "[C]onduct *intended* to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* (emphasis added).  Deputy Boyd's alleged sexual abuse shocks the conscience and violated Tyson's right to bodily integrity.

Defendants argue the alleged sexual abuse does not shock the conscience because Deputy Boyd did not effectuate it using physical force.  We disagree.  Physical force is not a requirement of a violation of the right to bodily integrity.  *See Windham v. Harris County*, 875 F.3d 229, 242 n.17 (2017).  Substantive due process violations can be based on mental coercion alone.  *See Leyra v. Denno*, 347 U.S. 556, 558 (1954); *see also Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir. 1998) (holding that officer's use of mental coercion to effectuate sexual assault violated the Fourteenth

Amendment); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1256 (10th Cir. 1996) (rejecting "that psychological abuse absent physical contact or a threat to bodily integrity is not a deprivation of constitutional rights"). Thus, we have recognized violations of the right to bodily integrity where the officer never physically touched the plaintiff and the plaintiff suffered purely psychological harm. *See Petta v. Rivera*, 143 F.3d 895, 903 (5th Cir. 1998); *Flores v. City of Palacios*, 381 F.3d 391, 400–01 (5th Cir. 2004). The use of mental coercion rather than physical coercion to effectuate sexual abuse is a distinction without a difference. Deputy Boyd's use of coercion to compel Tyson to engage in physical sex acts against her will violated her right to bodily integrity.

Defendants also argue that Deputy Boyd's conduct is merely verbal harassment, which we have held does not, by itself, support a constitutional claim. *See, e.g.*, *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997) ("It is clear that verbal abuse by a prison guard does not give rise to a cause of action under § 1983."); *McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) (same). But the alleged sexual assault in this case involved far more than verbal harassment. Nonconsensual stripping, prolonged nudity, and manual manipulation of the privates for an officer's sexual enjoyment are abusive sex acts that physically affected Tyson's body.

Deputy Boyd's alleged conduct was an outrageous abuse of power that shocks the conscience and violated Tyson's right to bodily integrity.

**2**

Our holding that Deputy Boyd violated Tyson's right to bodily integrity is not enough to defeat the defense of qualified immunity. Tyson

must demonstrate that the right was clearly established when the challenged conduct occurred.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Generally, plaintiffs point to "a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  "But that is not the only way to defeat qualified immunity." *Villareal v. City of Laredo*, 17 F.4th 532, 539 (5th Cir. 2021).  "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).  A "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Id.* (quoting *Lanier*, 520 U.S. at 271); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) ("Of course, in an obvious case, [general] standards can 'clearly establish' the answer, even without a body of relevant case law."); *Bartlett*, 981 F.3d at 330 (explaining that the Supreme Court's qualified immunity precedents allow for the "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the challenged conduct is sufficiently clear" (cleaned up) (quoting *Wesby*, 138 S. Ct. at 590–91)).  "The central concept is that of 'fair warning.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope*, 536 U.S. at 740).

In other words, "[q]ualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, *reasonably* misapprehends the law governing the circumstances [he] confronted." *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (per curiam) (emphasis added)

No. 21-40590

(quoting *Brosseau*, 543 U.S. at 198). It does not immunize those officials who commit novel, but patently "obvious," violations of the Constitution. *Hope*, 536 U.S. at 745. The Supreme Court has recently affirmed the vitality of this principle. *See Riojas*, 141 S. Ct. at 53–54 (reversing the grant of qualified immunity where the violation was "obvious" because "no reasonable [ ] officer could have concluded that" the alleged conduct was "constitutionally permissible"); *cf. McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (Mem.), *granting, vacating, and remanding*, 950 F.3d 226 (5th Cir. 2020) (directing reconsideration "in light of *Taylor*").

It is obvious that the right to bodily integrity forbids a law enforcement officer from sexually abusing a person by coercing them to perform nonconsensual physical sex acts for his enjoyment. As noted, we have long held that physical sexual abuse by a government official violates the Fourteenth Amendment. *See Guidry*, 456 F.3d at 506 n.7; *Rains Cnty. Indep. Sch. Dist.*, 66 F.3d at 1406; *Taylor ISD*, 15 F.3d at 450–52; *see also Whitley v. Hanna*, 726 F.3d 631, 650–51 (5th Cir. 2013) (Elrod, J., concurring) ("Sexual abuse by a state official is an undeniable violation of this liberty interest."). No degree of physical sexual abuse effected for a law enforcement officer's sexual gratification is justified by a legitimate governmental objective. *Cf. Riojas*, 141 S. Ct. at 54 (noting the complete lack of evidence of "necessity or exigency" justifying the officer's conduct). Regardless whether an officer uses physical or mental coercion, physical sexual abuse by a state official offends the Constitution. No reasonable officer could believe otherwise.

We have little trouble finding that the constitutional offense was obvious because the physical sexual abuse alleged here is a "particularly egregious" and "extreme circumstance[]" of assault by a state official. *Riojas*, 141 S. Ct. at 53–54. The record reflects that Deputy Boyd took advantage of his office to become acquainted with Tyson. He used the pretense of legitimate policy activity—a welfare check, in fact—to gain

15

entrance to Tyson's property. Upon arrival, he immediately ensured that Tyson was isolated and that his conduct would not be observed by neighbors or security cameras. Instead of proceeding to the welfare check, he then sexually harassed Tyson for nearly two hours. Ultimately, he committed physical sexual abuse by instructing her to perform nonconsensual physical sex acts for his sexual gratification. He told her to strip her privates, to manually manipulate her genitals, and to remain exposed while he masturbated to ejaculation. That Deputy Boyd's alleged physical sexual abuse violated Tyson's constitutional right to bodily integrity would have been obvious to any reasonable officer.

Defendants argue that we have held allegations of "more extensive sexual activity" insufficient to violate the right to bodily integrity. They cite to one unpublished opinion that we find factually inapposite. *See Copeland v. Nunan*, 250 F.3d 743, 2001 WL 274738 (5th Cir. 2001) (per curiam) (unpublished).

In *Copeland*, we considered a prisoner's allegations under the Eighth Amendment that his rights were violated when a clinical pharmacist fondled his penis and anus during a testicular examination that the prisoner requested and during two subsequent occasions. 250 F.3d at *3. We held that the pharmacist was entitled to qualified immunity because the prisoner "alleged nothing beyond merely *de minimis* physical or psychological injuries." *Id.* at *2. By contrast, the defendants here do not challenge the district court's finding that Tyson's significant psychological injuries satisfy the injury requirement for her Fourteenth Amendment claim. *See Tyson*, 2021 WL 3519294, at *5. Moreover, the facts in *Copeland*—brief, sexual touching by a clinical pharmacist during and subsequent to a testicular examination—are distinct from the facts here—involuntary stripping; coerced self-touch; and prolonged, nonconsensual exposure of a non-detainee's privates while an officer masturbated to ejaculation. *Copeland* "is too dissimilar . . . to create

any doubt about the obviousness of [Tyson's] right."[5] *Riojas*, 141 S. Ct. at 54 n.2.

By their nature, cases addressing the most flagrant forms of unconstitutional conduct seldom rise to the court of appeals. *See McCoy*, 950 F.3d at 236 (Costa, J., dissenting in part). When they do, the obviousness exception "plays an important role in . . . ensur[ing] vindication of the most egregious constitutional violations." *Id.* No reasonable officer could believe that it was constitutionally permissible to use the pretense of legitimate police activity to sexually abuse a person by coercing her to perform physical sex acts for the officer's sexual gratification. We hold that Tyson's right against physical sexual abuse by a government official was clearly established.

## C

Deputy Boyd argues that, even if his alleged sexual abuse of Tyson was a clearly established violation of her constitutional rights, he cannot be held liable because he did not act under color of law.

"It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49–50 (1988). We have addressed the color-of-law requirement twice before in similar circumstances. In *Bennett v. Pippin*,

---

[5] Defendants also cite three district court decisions. *See Guillot v. Castro*, No. CV 17-6117, 2018 WL 3475294 (E.D. La. July 19, 2018); *Chestang v. Alcorn State Univ.*, 820 F. Supp. 2d 772 (S.D. Miss. 2011); *Mims v. Oliver*, No. CV H-15-644, 2017 WL 3034032 (S.D. Tex. July 18, 2017), *report and recommendation adopted*, No. CV H-15-644, 2017 WL 3575706 (S.D. Tex. Aug. 17, 2017). The cases are factually inapposite. All three considered allegations of brief sexual touching over a fabric barrier. *See Guillot*, 2018 WL 3475294, at *1; *Chestang*, 820 F. Supp. 2d at 779–80; *Mims*, 2017 WL 3034032, at *1. That type of misconduct is not before us. None of the cases discuss the acts of sexual abuse alleged here: nonconsensual stripping, prolonged nudity, coerced self-touch, and masturbation. These cases do not leave a reasonable official with uncertainty whether the Constitution allowed him to use his authority to coerce a person to perform sexual acts for his gratification.

we held that a sheriff acted under color of law when he questioned the suspect of a criminal investigation on the porch of her home then allegedly returned later in the evening and sexually assaulted her. 74 F.3d 578, 589 (5th Cir. 1996). Although the alleged sexual assault occurred hours after the sheriff performed his official duty of questioning the plaintiff, we found a nexus between the assault and the sheriff's abuse of his official authority. *Id.* We recognized that the sheriff's "relationship with [the plaintiff] grew out of [his] investigation." *Id.* at 586. In addition, he used the authority of his office to determine her address and that she would be home alone. *Id.* at 589. And, during the assault, he coerced the plaintiff into compliance by implying that he was not subject to the rule of law because of his official office, stating: "I can do what I want, I'm the sheriff." *Id.* We also recognized that implicit coercion resulted from the plaintiff's status as a suspect in the sheriff's investigation, even though the sheriff did not explicitly verbalize a threat about the investigation in order to effectuate the assault. *Id.*

A decade later, we held that an assistant city attorney (ACA) acted under color of law when he sexually assaulted two women in his private office. *See United States v. Dillon*, 532 F.3d 379, 386 (5th Cir. 2008). There, the ACA also "took advantage of his position to initially become acquainted with his victims." *Id.* He similarly ensured that the women were alone and secluded by luring them to his office. *Id.* at 382. And we again recognized the ACA's indirect references to his power lent "an air of official authority" to the assault, even though he "never explicitly mentioned his position as an ACA" during the assault. *Id.* at 386–87. For example, with respect to one plaintiff that sought help getting her son released on parole, we held that the ACA's statement that he knew "a lot of police officers and he [could] have anybody arrested" was an implicit threat that reasonably "left her with the impression he could have her son re-arrested at any time." *Id.* at 383.

By contrast, we held that officers did not act under color of law where they did not use official power to facilitate their actions. *See, e.g.*, *Townsend v. Moya*, 291 F.3d 859, 860 (5th Cir. 2002) (holding that prison guard did not act under color of law when he stabbed inmate during game of horseplay unrelated to guard's official duties); *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. Unit A Jan. 1981) (holding that on-duty chief of police did not act under color of law when he assaulted his sister-in-law at police station because assault arose from purely private family dispute).

The facts of this case are more akin to *Bennett* and *Dillon*. As in those cases, Deputy Boyd's alleged relationship with Tyson grew out of legitimate police activity—Wade Tyson's request for a welfare check on his wife. *See Bennett*, 74 F.3d at 586; *see also Dillon*, 532 F.3d at 386. Deputy Boyd then allegedly used the authority of his office to determine Tyson's address, whether she would be home alone, and whether she had security at her home. *See Bennett*, 74 F.3d at 589. Like the ACA in *Dillon*, he relied on the pretense of legitimate activity—here, a wellness check—to maneuver Tyson to a more secluded part of her home. *See* 532 F.3d at 382.

And as in *Bennett* and *Dillon*, Deputy Boyd interwove sexual advances with his authority as a law enforcement officer, lending an "air of official authority" to the alleged sexual assault. *Dillon*, 532 F.3d at 386–87; *see Bennett*, 74 F.3d at 589. For example, Deputy Boyd coupled a story about his duty as an officer to ticket attendees of a swinger club for drug possession, with inappropriate details about the swinger club and related questioning about Tyson's sex life with her husband. As another example, Deputy Boyd told Tyson that he and fellow officers had been watching her in a restaurant and talking about "what they would like to do to [her]." This statement reasonably left Tyson with the impression that she could not trust local law enforcement because it was unclear which officers were connected with

Deputy Boyd.  The record supports a nexus between the alleged misconduct and Deputy Boyd's abuse of his official authority.

Deputy Boyd argues that he did not act under color of law because he "was not on duty" and only Tyson's "subjective belief" supports otherwise. But "[w]hether an officer is acting under color of state law does not depend on his on- or off-duty status at the time of the alleged violation." *Bustos v. Martini Club Inc.*, 599 F.3d 458, 464 (5th Cir. 2010).  Critically, Tyson's "subjective belief" that Deputy Boyd was acting under color of law was born directly from his conduct leading her to think as much. *See Gomez v. Galman*, 18 F.4th 769, 776 (5th Cir. 2021) (holding that two off-duty officers in plain clothes who did not identify themselves acted under color of law during assault because their tone of voice reasonably led plaintiff to believe they were police officers).  We also reject that Deputy Boyd did not act under color of law simply because he did not wear a uniform or weapon.  Although a uniform and weapon can support that an officer acted under color of law, neither is required.  *Id.* (holding that off-duty officers not in uniform acted under color of law); *Bennett*, 74 F.3d at 583 (same).  Deputy Boyd verbally identified himself as a sheriff at the outset and wore a shirt identifying himself as a sheriff during the incident.  *See Galman*, 18 F.4th at 776 ("Defendants' . . . identification of themselves as officers of the law [ ] adds to the 'air of official authority' that pervaded the assault." (quoting *United States v. Tarpley*, 945 F.2d 806, 809 (5th Cir. 1991))).

Finally, Deputy Boyd argues that he did not act under color of law because "the 'real reason' for [his] visit to her house was not related to law enforcement, but rather to engage in sexual activity."  But officials who act for purely personal reasons do not "necessarily fail to act 'under color of law.'"  *Tarpley*, 945 F.2d at 809 (quoting *Brown v. Miller*, 631 F.2d 408, 411 (5th Cir. 1980)).  It is only "[i]f an officer pursues personal objectives *without* using his official power as a means to achieve his private aim[] [that] he has

not acted under color of state law." *Bustos*, 599 F.3d at 465 (emphasis added).

Deputy Boyd acted under color of law during the alleged sexual abuse.

## D

In summary, we hold that Deputy Boyd's alleged sexual abuse violated Tyson's clearly established right to bodily integrity. Thus, Deputy Boyd is not entitled to qualified immunity. We need not reach the claims against the County and the Sheriff. We remand those issues to the district court to address in the first instance. *See Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018).

\* \* \*

We AFFIRM the order of the district court with respect to the dismissal of the plaintiff's Fourth Amendment claim. We REVERSE the order of the district court with respect to the dismissal of the plaintiff's Fourteenth Amendment claim. And we REMAND for further proceedings.